Filed 10/25/16

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE, | B265614 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. TA051184) |
| v. | |
| MARIO SALVADOR PADILLA, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, John J. Cheroske, Judge. Reversed and remanded with directions.

Jonathan E. Demson, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Shawn McGahey Webb and Paul M. Roadarmel, Jr., Deputy Attorneys General, for Plaintiff and Respondent.

In 1999, appellant Mario Salvador Padilla was convicted of a murder he committed when sixteen years old, and was sentenced to a term of life without the possibility of parole (LWOP). In the underlying proceeding for writ of habeas corpus, appellant sought resentencing in light of *Miller v. Alabama* (2012) 567 U.S. ___, ___ [132 S.Ct. 2455, 2460, 2469] (*Miller*). After conducting a resentencing hearing, the trial court reimposed the LWOP term. Following that ruling, the United States Supreme Court decided *Montgomery v. Louisiana* (2016) 577 U.S. ___ [136 S.Ct. 718] (*Montgomery*), which held that *Miller* announced a substantive rule of law that had retroactive application in state collateral review proceedings. In so holding, the United States Supreme Court clarified and elaborated on its earlier holding in *Miller*. Because the trial court exercised its discretion in resentencing appellant without the guidance provided by *Montgomery*, we reverse its ruling and remand for a new resentencing hearing.

## RELEVANT FACTUAL AND PROCEDURAL BACKGROUND

In July 1999, a jury convicted appellant of the murder of his mother Gina Castillo (Pen. Code § 187, subd. (a)) and conspiracy to murder his stepfather Pedro Castillo (Pen. Code, § 182, subd. (a)(1)).[1] The jury found true special-circumstance allegations that the murder was committed in

---

[1] All further statutory citations are to the Penal Code.

2

the course of a robbery and while lying in wait (§ 190.2, subds. (15), (17)(A)).  The trial court imposed an LWOP term on the murder conviction (§ 190.5, subd. (b)), and imposed and stayed a term of 25 years to life on the conviction for conspiracy to commit murder (§ 654).  In an unpublished opinion (*People v. Padilla* (June 1, 2001, B135651), this court determined there was insufficient evidence to support the lying-in-wait special-circumstance finding, but otherwise affirmed appellant's judgment of conviction.

In 2012, the United States Supreme Court decided *Miller*, which held that the Eighth Amendment of the United States Constitution "forbids a sentencing scheme that mandates life in prison without possibility of parole for juvenile offenders," and set forth factors controlling the determination whether that penalty may be imposed on such a juvenile.  (*Miller, supra,* 132 S.Ct. at pp. 2469-2470.)

In August 2014, appellant filed a petition for writ of habeas corpus in the superior court, seeking resentencing under *Miller*.  On July 15, 2015, after respondent admitted that appellant was entitled to a resentencing hearing, the court conducted that hearing and resentenced appellant to an LWOP term.  Appellant noticed this appeal from that ruling.  In January 2016, while the appeal was pending, the United States Supreme Court issued its decision in *Montgomery*, which concluded that *Miller* announced a substantive rule of law that applies retroactively on state collateral review to juvenile offenders whose convictions and sentences were final when *Miller* was decided.  (*Montgomery*,

3

*supra*, 136 S.Ct. at pp. 727, 729, 736).[2]

## DISCUSSION

Appellant maintains that the trial court erred in resentencing him to an LWOP term, contending (1) that *Miller* and *Montgomery* preclude the imposition of such a sentence on juvenile offenders convicted of a homicide, and alternatively, (2) that the court exercised its sentencing discretion without the benefit of *Montgomery*. As explained below, we conclude that although neither *Miller* nor *Montgomery* expressly forbids LWOP terms for juvenile offenders convicted of a homicide, the court's resentencing decision does not reflect the guidance provided by *Montgomery*.

### A. *Governing Principles*

We are governed by the supremacy clause (U.S. Const., art. VI, cl. 2), pursuant to which we follow decisions of the United States Supreme Court on matters of constitutional

---

[2] We note that in August 2013, appellant also filed a petition for recall and resentencing under section 1170(d)(2), which authorizes the resentencing of certain defendants sentenced as juveniles to an LWOP term. The trial court (a different judge) found that appellant's offense involved torture, and thus ruled that he was ineligible for resentencing under section 1170(d)(2). This court reversed that order and remanded the matter for further proceedings (*People v. Padilla* (Nov. 20, 2015, B257408) [nonpub. opn.]).

interpretation (*Calderon v. City of Los Angeles* (1971) 4 Cal.3d 251, 258 (*Calderon*)), including the proscription against cruel and unusual punishment in the Eighth Amendment (*People v. Mantanez* (2002) 98 Cal.App.4th 354, 358).

    1. *Key United States Supreme Court Decisions Prior to* Miller

   *Miller* and *Montgomery* rely on two prior high court decisions addressing the application of the proscription against cruel and unusual punishment to juvenile offenders, namely, *Roper v. Simmons* (2005) 543 U.S. 551 (*Roper*) and *Graham v. Florida* (2010) 560 U.S. 48 (*Graham*).  In *Roper*, the court held that the Eighth Amendment bars the imposition of the death penalty on juvenile offenders, relying on the existence of a consensus against that practice, as well as certain differences between juveniles and adults.  (*Roper*, *supra*, 543 U.S. at pp. 564-570, 578-579.)  The court observed that juveniles generally exhibit less maturity and an underdeveloped sense of responsibility, are more vulnerable to outside influences, and lack a well-formed character.  (*Id.* at pp. 569-570.)  In view of those differences, the court explained, the penological justifications for the death penalty -- retribution and deterrence -- apply with lesser force to juveniles; their diminished culpability and lack of foresight call into question whether the death penalty is merited or acts as a deterrent.  (*Id.* at pp. 571-572.)  While acknowledging the possibility that in "a rare case" the death

penalty might be warranted, the court adopted a categorical rule barring capital punishment in order to foreclose the risk of its imposition "despite insufficient culpability." (*Id.* at pp. 572-573.) As the court observed: "It is difficult even for expert psychologists to differentiate between the juvenile offender whose crime reflects unfortunate yet transient immaturity, and the rare juvenile whose crime reflects irreparable corruption." (*Id.* at p. 573.)

In *Graham*, the court adopted a categorical rule barring the imposition of LWOP terms on juvenile nonhomicide offenders. (*Graham, supra,* 560 U.S. at p. 81.) As in *Roper*, the court relied on the existence of a consensus against that practice, as well as the features of juveniles relating to the penological justifications for imposing an LWOP term. (*Graham, supra,* at pp. 61-79.) The court rejected a case-by-case approach to such sentencing, pointing to the difficulties in distinguishing "with sufficient accuracy . . . the few incorrigible juvenile offenders from the many that have the capacity for change." (*Id.* at p. 77.)

> 2. *United States Supreme Court's Decision in* Miller

In *Miller*, the high court expressly declined to decide whether the Eighth Amendment requires a "categorical bar" to LWOP terms for juvenile offenders convicted of a homicide, but held that the Eighth Amendment forbids sentencing schemes mandating such punishment. (*Miller, supra*, 132 S.Ct. at p. 2469.) The court relied primarily on

*Roper* and *Graham*, and a strand of decisions traceable to *Woodson v. North Carolina* (1976) 428 U.S. 280 (plur. opn.), which required individualized sentencing in death penalty cases. (*Miller*, *supra*, 132 S.Ct. at p. 2463-2464.) In *Roper* and *Graham*, the court explained, "emphasized that the distinctive attributes of youth diminish the penological justifications for imposing the harshest sentences on juvenile offenders, even when they commit terrible crimes." (*Id.* at p. 2465.) The court further stated that *Roper* and *Graham*, like the cases in the second strand of decisions, "teach that in imposing a State's harshest penalties, a sentencer misses too much if he treats every child as an adult." (*Id.* at p. 2468.)

The court thus concluded that the Eighth Amendment forbids sentencing schemes mandating LWOP terms for juvenile offenders: "Mandatory life without parole for a juvenile precludes consideration of his chronological age and its hallmark features -- among them, immaturity, impetuosity, and failure to appreciate risks and consequences. It prevents taking into account the family and home environment that surrounds him -- and from which he cannot usually extricate himself -- no matter how brutal or dysfunctional. It neglects the circumstances of the homicide offense, including the extent of his participation in the conduct and the way familial and peer pressures may have affected him. Indeed, it ignores that he might have been charged and convicted of a lesser offense if not for incompetencies associated with youth -- for example, his

7

inability to deal with police officers or prosecutors (including on a plea agreement) or his incapacity to assist his own attorneys. [Citations.] And finally, this mandatory punishment disregards the possibility of rehabilitation even when the circumstances most suggest it." (*Miller, supra,* 132 S.Ct. at p. 2468.)

In declining to examine whether the Eighth Amendment required a "categorical bar" to LWOP terms for juveniles, the court remarked: "[W]e think appropriate occasions for sentencing juveniles to this harshest possible penalty will be uncommon. That is especially so because of the great difficulty we noted in *Roper* and *Graham* of distinguishing at this early age between 'the juvenile offender whose crime reflects unfortunate yet transient immaturity, and the rare juvenile offender whose crime reflects irreparable corruption.' [Citations.] Although we do not foreclose a sentencer's ability to make that judgment in homicide cases, we require it to take into account how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison." (*Miller, supra,* 132 S.Ct. at p. 2469, quoting *Roper,* 543 U.S. at p. 573, and *Graham,* 560 U.S. at pp. 2026-2027.)

The court further explained that its holding did not rely on the existence of a consensus against mandatory LWOP terms for juveniles convicted of murder, even though there was strong evidence of such a consensus. (*Miller, supra,* 132 S.Ct. at pp. 2471-2472.) The court regarded the case before it as different from "the typical one in which [it] .

8

. . tallied legislative enactments," stating: "Our decision does not categorically bar a penalty for a class of offenders or type of crime -- as, for example, we did in *Roper* or *Graham*. Instead, it mandates only that a sentencer follow a certain process -- considering an offender's youth and attendant characteristics -- before imposing a particular penalty. And in so requiring, our decision flows straightforwardly from our precedents: specifically, the principle of *Roper, Graham*, and our individualized sentencing cases that youth matters for purposes of meting out the law's most serious punishments. When both of those circumstances have obtained in the past, we have not scrutinized or relied in the same way on legislative enactments. [Citations.]" (*Miller*, *supra*, 132 S.Ct. at p. 2471.)

### 3. *California Decisions Applying* Miller

In the wake of *Miller* but prior to *Montgomery*, California courts examined the consequences of *Miller* for sentencing pursuant to subdivision (b) of section 190.5 (section 190.5(b)), under which appellant's LWOP term was originally imposed.[3] That statute authorizes the trial court

---

[3]   Subdivision (b) of section 190.5 provides: "The penalty for a defendant found guilty of murder in the first degree, in any case in which one or more special circumstances enumerated in Section 190.2 or 190.25 has been found to be true under Section 190.4, who was 16 years of age or older and under the age of 18 years at the time of the commission of the crime, shall be confinement in the state prison for life *(Fn. continued on next page.)*

9

to impose an LWOP term on a juvenile defendant guilty of first degree murder who was 16 years or older at the time of the offense, provided at least one special circumstance enumerated in sections 190.2 or 190.25 is found to be true. Those special circumstances include the fact that the murder was committed in the course of a robbery. (§ 190.2, subd. (a)(17)(A).) Under section 190.5(b), the court has the discretion to impose an alternative sentence of 25 years to life.

*People v. Gutierrez* (2014) 58 Cal.4th 1354, 1361 (*Gutierrez*) involved consolidated appeals by two defendants sentenced before *Miller* to LWOP terms for murders they committed as juveniles. Our Supreme Court examined whether, in light of *Miller*, section 190.5(b) had properly been construed by appellate courts to establish a presumption favoring the imposition of LWOP sentences. (*Gutierrez, supra,* 58 Cal.4th at pp. 1368-1370.) The court concluded that the statute conferred discretion on sentencing courts to impose either an LWOP term or a term of 25 years to life on 16- and 17-year-old offenders convicted of special circumstance murder, with no presumption in favor of an LWOP term. (*Gutierrez, supra,* at p. 1387.)

The court further held that a sentencing court, in exercising its discretion under section 190.5(b), must consider the factors identified in *Miller*. (*Gutierrez, supra,*

---

without the possibility of parole or, at the discretion of the court, 25 years to life."

58 Cal.4th at pp. 1387-1390.) As the court observed, those factors effectively divide into five categories, namely, evidence regarding (1) the defendant's level of maturity at the time of the crime, (2) the defendant's family environment, (3) the circumstances of the crime, (4) the existence of a youth-related incompetency that prevented the defendant from being convicted of a lesser crime, and (5) the defendant's "'possibility of rehabilitation.'" (*Id.* at pp. 1388, 1389, quoting *Miller*, *supra*, 132 S.Ct. at p. 2468.) In remanding the cases before it for resentencing, the court stated: "The question is whether each [defendant] can be deemed, at the time of sentencing, to be irreparably corrupt, beyond redemption, and thus unfit ever to reenter society, notwithstanding the 'diminished culpability and greater prospects for reform' that ordinarily distinguish juveniles from adults." (*Gutierrez, supra,* at p. 1391, quoting *Miller, supra*, 132 S.Ct. at p. 2464.)

Following *Gutierrez*, the appellate court in *People v. Palafox* (2014) 231 Cal.App.4th 68, 73 (*Palafox*) examined how the trial court must evaluate the *Miller* factors in imposing an LWOP term under section 190.5(b). There, the defendant was sentenced to two consecutive LWOP terms for two special-circumstances murders he committed when 16 years old. (*Palafox, supra,* 231 Cal.App.4th at p. 73.) As *Miller* was decided while his initial appeal from that judgment was pending, the appellate court remanded the matter for resentencing. (*Id.* at pp. 74-75.) Upon remand, the trial court, in examining the *Miller* factors, stated that it

11

could not exclude the "'significant possibility'" of the defendant's rehabilitation, but resentenced the defendant to two consecutive LWOP terms. (*Palafox, supra,* at pp. 79, 80.)

Affirming that ruling, the *Palafox* court placed special emphasis on the statement in *Miller* that it "'mandate[d] *only* that a sentencer follow a certain process -- considering an offender's youth and attendant characteristics -- before imposing a particular penalty.'" (*Palafox, supra*, 231 Cal.App.4th at p. 88, italics omitted.) While acknowledging that the key sentencing question was as set forth in *Gutierrez*, the appellate court found no specific directive in *Gutierrez* regarding how the trial court must assess the *Miller* factors. (*Id.* at p. 90.) The court concluded that the sentence was constitutionally sound despite the trial court's inability to exclude the possibility of rehabilitation, stating: "No particular factor, relevant to the decision whether to impose LWOP on a juvenile who has committed murder, predominates under the law. Hence, as long as a trial court gives due consideration to an offender's youth and attendant characteristics, as required by [*Miller*] . . . , it may, in exercising its discretion under [section 190.5], give such weight to the relevant factors as it reasonably determines is appropriate under all the circumstances of the case." (*Id.* at pp. 73, 91.)

4. *United States Supreme Court's Decision in* Montgomery

The overarching issue presented in *Montgomery* was whether *Miller* had retroactive application in state collateral review proceedings. (*Montgomery, supra,* 136 S.Ct. at pp. 727, 729, 736.)[4] In resolving that issue, the high court's discussion proceeded in two stages. The court first determined that "when a new substantive rule of constitutional law controls the outcome of a case, the Constitution requires state collateral review courts to give retroactive effect to that rule." (*Id.* at p. 729.) In this context, the court explained, "Substantive rules . . . set forth categorical constitutional guarantees that place certain criminal laws and punishments altogether beyond the State's power to impose. . . . Procedural rules, in contrast, are designed to enhance the accuracy of a conviction or sentence by regulating "'the manner of determining the defendant's culpability.'"" (*Id.* at pp. 729-730, quoting *Schriro v. Summerlin* (2004) 542 U.S. 348, 353, italics

---

[4]    It was undisputed that the court's decision in *Teague v. Lane* (1989) 489 U.S. 288 required the retroactive application of new substantive rules in federal habeas proceedings. Left open was the question whether states were required as a constitutional matter to give retroactive effect to new substantive rules on state collateral review. (*Montgomery, supra,* 136 S.Ct. at pp. 728-729.)

13

deleted.) Turning to *Miller*, the high court concluded that it announced a substantive rule of law, and thus had retroactive application in state collateral review proceedings. (*Montgomery*, *supra*, 136 S.Ct. at pp. 732-737.)

Our focus is on the second stage of the discussion in *Montgomery*. *Miller* set forth a substantive rule, the high court explained, because it identified a class of defendants for whom LWOP terms were unconstitutional. (*Montgomery*, *supra*, 136 S.Ct. at pp. 732-737.) *Miller* recognized that "'the distinctive attributes of youth'" reduce culpability and increase the prospect of reform, and thus "'diminish the penological justifications'" for imposing LWOP terms on juveniles. (*Montgomery, supra,* at p. 733, quoting *Miller*, *supra*, 132 S.Ct. at p. 2465.) "The Court recognized that a sentencer might encounter the rare juvenile offender who exhibits such irretrievable depravity that rehabilitation is impossible . . . . But in light of 'children's diminished culpability and heightened capacity for change,' *Miller* made clear that 'appropriate occasions for sentencing juveniles to this harshest possible penalty will be uncommon." *Montgomery, supra,* at pp. 733-734, quoting *Miller, supra,* 132 S.Ct. at p. 2469. For that reason, the court explained, "*Miller* . . . did *more* than require a sentencer to consider a juvenile offender's youth before imposing life without parole . . . [Citation.] Even if a court considers a child's age before sentencing him or her to a lifetime in prison, that sentence still violates the Eighth Amendment for a child whose crime reflects "'unfortunate yet transient immaturity.'"

14

[Citations.] Because *Miller* determined that sentencing a child to life without parole is excessive for all but "'the rare juvenile offender whose crime reflects irreparable corruption'" [citation], it rendered life without parole an unconstitutional penalty for 'a class of defendants because of their status' -- that is, juvenile offenders whose crimes reflect the transient immaturity of youth. [Citation.] As a result, *Miller* announced a substantive rule of constitutional law." (*Montgomery*, *supra*, 136 S.Ct. at p. 734.)

The court clarified that two remarks in *Miller* -- first, that its holding "'d[id] not categorically bar a penalty for a class of offenders or type of crime [,] as . . . [done] in *Roper* or *Graham*,'" and second, that the holding "mandate[d] only . . . a certain process" -- did not support the contrary conclusion. (*Montgomery*, *supra*, 136 S.Ct. at p. 734, quoting *Miller, supra,* 132 S.Ct. at p. 2471.) The first remark, the court explained, reflected an insignificant difference between the classes designated in *Roper* and *Graham* and the class designated in *Miller*: "*Miller*, it is true, did not bar a punishment for all juvenile offenders, as the Court did in *Roper* or *Graham*. *Miller* did bar life without parole, however, for all but the rarest of juvenile offenders, those whose crimes reflect permanent incorrigibility. For that reason, *Miller* is *no less substantive* than are *Roper* and *Graham*. Before *Miller*, every juvenile convicted of a homicide offense could be sentenced to life without parole. After *Miller*, it will be the rare juvenile offender who can receive that same sentence. The only difference between

15

*Roper* and *Graham,* on the one hand, and *Miller*, on the other hand, is that *Miller* drew a line between children whose crimes reflect transient immaturity and those rare children whose crimes reflect irreparable corruption." (*Montgomery*, *supra*, 136 S.Ct. at p. 734, italics added.)

The second remark, the court explained, conveyed only that the holding in *Miller* had "a procedural component," not that it was a procedural rule, for purposes of the retroactivity principle. (*Montgomery*, *supra*, 136 S.Ct. at p. 734.) That procedural component differed from a procedural rule, as it was "necessary to implement a substantive guarantee . . . ." (*Id.* at p. 734.) The court elaborated: "There are instances in which a substantive change in the law must be attended by a procedure that enables a prisoner to show that he falls within the category of persons whom the law may no longer punish. [Citations.] . . . Those procedural requirements do not, of course, transform substantive rules into procedural ones. [¶] The procedure *Miller* prescribes is no different. A hearing where 'youth and its attendant characteristics' are considered as sentencing factors is necessary to separate those juveniles who may be sentenced to life without parole from those who may not." (*Id.* at p. 735, quoting *Miller*, *supra*, 132 S.Ct. at p. 2460.)

The court also clarified why *Miller* refrained from mandating that trial courts make a finding regarding "a child's incorrigibility." (*Montgomery*, *supra*, 136 S.Ct. at p. 735.) That aspect of *Miller* reflected a concern linked to

16

federalism, namely, that states be afforded latitude to develop appropriate procedures. (*Ibid.*) Any such latitude, however, was not open-ended: "That *Miller* did not impose a formal factfinding requirement does not leave [s]tates free to sentence a child whose crime reflects transient immaturity to life without parole. To the contrary, *Miller* established that this punishment is disproportionate under the Eighth Amendment." (*Ibid.*)

B. *Underlying Proceedings*

In ruling on appellant's request for resentencing, the trial court had before it the facts established at his trial, as well as evidence regarding his post-conviction conduct and potential for rehabilitation.

1. *Trial Evidence*

In January 1998, appellant was 16 years old and lived with his mother, Gina Castillo, and his stepfather, Pedro Castillo.[5] He shared a bedroom with his baby sister. In that room, Gina and Pedro placed a piggy bank for the baby containing more than $100.

Gina and Pedro forbade appellant to visit his cousin Samuel Ramirez, who lived with appellant's grandmother. On several occasions, appellant told a schoolmate that he intended to kill his parents because they were strict with

---

[5]     As appellant's victims share a surname, we refer to them by their first names.

him, made him do chores, and would not let him "go out." The schoolmate also heard Ramirez say that "it would be 'cool' to kill" appellant's parents.

During the morning of January 13, 1998, appellant and Ramirez were in an arcade with a friend. Appellant told the friend that he and Ramirez were going to kill Gina because "it was a perfect day to do it." After showing Hernandez a knife, appellant said that after killing Gina, he intended to take some money.

On the same date, at approximately 2:30 p.m., Los Angeles County Sheriff's Department deputy sheriffs responded to a 911 call regarding appellant's residence. Inside, they found Gina lying on the floor, suffering from multiple wounds and covered with blood. She told the deputy sheriffs that appellant had inflicted her injuries. Nearby, they found some knives. Later, Pedro discovered that the piggy bank in appellant's bedroom was missing.

Investigating officers interviewed appellant twice shortly after Gina's death. After initially denying involvement in Gina's murder, he provided an account of the crime. Appellant stated that he and Ramirez discussed killing Gina and Pedro for more than a month prior to January 13, 1998. According to appellant, killing his parents was his idea. The idea arose from "frustration" regarding his lack of freedom, as his parents did not "let [him] go out anywhere."

Appellant further stated that on the day of the murder he arose and gave the appearance of leaving for school, but

went to an arcade, where he met Ramirez. At approximately 2:25 p.m, they entered appellant's residence, where Gina was seated at a computer table. Although their faces were covered, Gina recognized appellant. When appellant stabbed Gina with a knife, she struggled and took away the knife. Ramirez secured a second knife and held Gina down, but Gina broke the second knife. At some point, appellant obtained a third knife that Ramirez had brought with him and stabbed Gina in the neck and chest. As Gina struggled with them, she recognized Ramirez and said, "'Help me!'" She also said, "I'm dying." Because Gina was screaming appellant's name, he put a rag in her mouth. After attacking Gina, appellant washed his hands and fled with Ramirez.

During the second interview, appellant stated that for three or four weeks, he planned with Ramirez to kill Gina and Pedro. As part of the plan, they intended to take some money appellants' parents had set aside for appellant's baby sister. He also acknowledged that at some point, they contemplated killing a female schoolmate in a manner derived from a movie called "Scream." Prior to killing Gina, appellant and Ramirez smoked marijuana. When asked how he felt after the killing, appellant replied, "Terrible, I felt like just killing myself too."

### 2. *Evaluations of Potential for Rehabilitation and Reports Regarding Post-Conviction Conduct*

Prior to the resentencing hearing, appellant submitted several reports and declarations regarding his potential for

19

rehabilitation and conduct while in prison. According to a social history and assessment prepared with the assistance of Licensed Clinical Social Worker Miya Sumii, appellant was immature at the time of his offenses, as he then "had limited life experiences and limited ability to weigh the risk[s] and consequences of his actions." The social history and assessment noted that at the time of the murder, appellant was subject to fantasies derived from horror movies, and killed Gina while under the influence of marijuana. The social history and assessment opined that appellant had "great potential" for rehabilitation, in view of the steps he had taken toward rehabilitation while serving his sentence.

In a review of records for appellant held by the California Department of Correction and Rehabilitation, retired associate warden Daniel J. Fulks stated that Appellant's disciplinary history was "extremely commendable." Appellant had been discipline-free for 14 of his 15 years of incarceration, and there was no documented criminal or gang activity. According to Fulks, appellant's sole disciplinary violation, which occurred in 2000, was for possession of inmate-manufactured alcohol. Fulks further stated that while incarcerated, appellant had earned his GED and participated in several vocational training programs.

Barry A. Krisberg, a Ph.D. in sociology, opined that appellant exhibited "an excellent capacity to rehabilitate and reintegrate into society." According to Krisberg, appellant

had a "remarkable record of good behavior" while imprisoned, was respectful to staff and peers, and "took advantage of every program and self-help opportunity available to him."

In addition to this evidence, appellant submitted declarations from several persons familiar with his religious beliefs. John Pape stated he was a religious volunteer at Central Juvenile Hall, where appellant was once placed. When appellant was moved to prison, Pape maintained contact with him through visits, phone calls, and letters. According to Pape, appellant was an immature 16-year-old when they first met. Since that time, appellant had matured and acquired religious beliefs. Pape opined that appellant's ongoing participation in religious programs reflected "a genuine desire and capacity for rehabilitation."

David Waagan, a member of the Jehovah's Witnesses, stated that in 2006, he conducted appellant's baptism while appellant was incarcerated at Pelican Bay State Prison. According to Waagan, "[n]ot anyone can be baptized," as an individual must undergo lengthy preparation and demonstrate "progressive changes."

Gerald Gormly and David Griffin, who had contact with appellant at Pelican Bay State Prison as religious volunteers, stated that he demonstrated maturity and sincere religious convictions.

### 3. *Testimony at Resentencing Hearing*
Griffin and Pape also testified at the resentencing

hearing.  Griffin stated that in 2006, he encountered appellant for approximately six months.  Appellant had then been baptized as a Jehovah's Witness.  Few inmates had done so, as baptism as a Jehovah's Witness required comprehensive knowledge of the Bible.  Griffin regarded appellant as a "very sincere" and "very serious" person. According to Griffin, appellant was also well regarded by the prison staff because he was among the small group of inmates who had a job.  Griffin acknowledged that he was not a trained psychologist, and that he was unaware of some aspects of appellant's crime.

Pape testified that he believed appellant's mature conduct to be sincere.  In addition to acknowledging that he had no background in psychology, Pape stated that he did not know that after the murder, appellant displayed an interest in the movie "Scream," and asked his counselors to secure a copy of its sequel.

### 4.  *Trial Court's Ruling*

Following the presentation of evidence, the trial court resentenced appellant to an LWOP term on the murder conviction.  After summarizing the *Miller* factors and other applicable principles, the court found that that there was no evidence of "abuse, neglect, family alcohol [abuse], drug abuse, lack of parenting, lack of education[,] or any prior acts of exposure to any violence," and no evidence that appellant might have been convicted of a lesser crime but for his youth.  The court made detailed findings regarding the

circumstances surrounding the murder, but no express finding regarding appellant's potential for rehabilitation.[6]

C. *Analysis*

For the reasons discussed below, we conclude that although the United States Supreme Court has not announced a categorical bar to the imposition of an LWOP term on appellant's offense, the matter must be remanded for resentencing in light of *Montgomery*.

---

[6] Regarding the circumstances surrounding the murder, the trial court found that it was planned as a crime for robbery and murder, and that appellant appreciated the pertinent consequences and risks. The court further stated: "[Appellant] planned to kill several people. . . . Other girls in school. He planned to first terrorize them by making telephone calls using a voice modulator to disguise his voice but more importantly to be that of a sinister film character. He didn't have the money to purchase such a device and he knew his 2 months old sister had a donation bag in her room which contained donations of those making visits to the new baby and to the family. He further planned to create the appearance of a botched robbery gone bad by the presence of his mother catching the robber. He knew he had to kill her when he went into the house. He brought knives for that very purpose. During the 45 stab wounds to her body, some of those knives broke. He supplemented his weapons by using household kitchen knives and finally when that didn't work he used a screwdriver to finish her, he thought. While he and his accomplice fled with the [baby's] money . . . . He left a one or 2 months old infant to be on her own. . . ."

23

### 1. *No Categorical Ban Against LWOP Terms for Juvenile Offenders*

We begin with appellant's contention that in view of the analytical framework underlying *Miller, Roper,* and *Graham*, the Eighth Amendment must be "understood to prohibit any sentence of life without parole in the case of the juvenile offender." As appellant notes, *Miller* acknowledged the "great difficulty" noted in *Roper* and *Graham* "of distinguishing . . . between 'the juvenile offender whose crime reflects . . . transient immaturity, and the rare juvenile offender whose crime reflects irreparable corruption.'" (*Miller*, *supra*, 132 S.Ct. at p. 2469, quoting *Roper,* 543 U.S. at p. 573, and *Graham,* 560 U.S. at p. 2026.) Appellant argues that because the risk of error attendant to drawing such a distinction underpinned the categorical bans on punishment announced in *Roper* and *Graham*, that risk also mandates the same result with respect to LWOP terms for juvenile offenders convicted of murder.

Although fully informed by *Roper* and *Graham*, *Miller* expressly declined to announce such a categorical ban. (*Miller*, *supra*, 132 S.Ct. at p. 2469.) Rather, as explained in *Montgomery*, *Miller* set forth a substantive ban on LWOP terms for juveniles whose crimes reflect transient immaturity, rather than irreparable corruption, together with procedural requirements for distinguishing that class of juveniles. In so holding, *Miller* impliedly found that for purposes of the substantive ban in question, the risk of error attending such a procedure, if properly implemented, did not

24

manifestly offend the Eighth Amendment.  We are bound by that ruling.  (*Calderon*, *supra*, 4 Cal.3d at p. 258.)

　　　　　2.  *Application of* Miller *in Light of* Montgomery

We turn to appellant's challenges to the trial court's application of *Miller*.  Because we must follow the United States Supreme Court's most recent pronouncement on the Eighth Amendment when the high court's decisions may differ on a legal point, we apply the interpretation of *Miller* set forth in *Montgomery*.  (See *Sei Fujii v. State of California* (1952) 38 Cal.2d 718, 728; *In re Lane* (1962) 58 Cal.2d 99, 105; *Meddock v. County of Yolo* (2013) 220 Cal.App.4th 170, 176, fn. 6; 9 Witkin, Cal.Procedure (5th ed. 2008) Appeal, § 541, pp. 611-613.)

In determining that *Miller* applies retroactively on state collateral review, *Montgomery* significantly recast *Miller*.  Under *Montgomery*, *Miller* must be regarded as announcing a substantive rule barring LWOP terms for a specific class of juvenile offenders, namely, those "'whose crimes reflect the transient immaturity of youth,'" not irreparable corruption.  (*Montgomery*, *supra*, 136 S.Ct. at p. 743.)  As explained in *Montgomery*, that substantive rule bars LWOP terms "for all but the rarest of juvenile offenders, those whose crimes reflect permanent incorrigibility."  (*Montgomery*, *supra*, at p. 734.)  The application of *Miller* in state collateral review proceedings thus targets a specific question -- that is, whether the juvenile offender's crime arose from irreparable corruption,

rather than transient immaturity -- the focal point of which is the existence of "permanent incorrigibility." (*Id.* at p. 734.)

Furthermore, under *Montgomery*, *Miller* mandates the employment of a procedure that clearly addresses and resolves that question. As set forth in *Montgomery*, *Miller* requires "a procedure that enables a prisoner to show that he falls within the category of persons whom the law may no longer punish." (*Montgomery*, *supra*, 136 S.Ct. at p. 735.) Only considerations regarding federalism motivated *Miller* to refrain from requiring that trial courts make a finding regarding "a child's incorrigibility." (*Ibid.*) Although states are afforded latitude regarding the procedure, its design as implemented must resolve the key question, as states are not "free to sentence a child whose crime reflects transient immaturity to life without parole." (*Ibid.*)

In our view, the stringent standard set forth in *Montgomery* cannot be satisfied unless the trial court, in imposing an LWOP term, determines that in light of all the *Miller* factors, the juvenile offender's crime reflects irreparable corruption resulting in permanent incorrigibility, rather than transient immaturity. *Montgomery* thus vitiates *Palafox*, upon which respondent relies, which concluded, without the benefit of *Montgomery*, that a trial court complies with *Miller* "as long as [it] gives due consideration to an offender's youth and attendant characteristics," without ruling out the possibility that the offender was subject to rehabilitation. (*Palafox*, *supra*, 231 Cal.App.4th at

26

pp. 73, 90-92.) In view of *Montgomery*, the trial court must assess the *Miller* factors with an eye to making an express determination whether the juvenile offender's crime reflects permanent incorrigibility arising from irreparable corruption.[7]

---

[7] *People v. Chavez* (2014) 228 Cal.App.4th 18, upon which respondent also relies, does not assist respondent. In *Chavez*, prior to *Miller* and *Gutierrez* the trial court imposed an LWOP term following a juvenile offender's murder conviction. (*Chavez, supra*, 228 Cal.App.4th at pp. 32-34.) As the trial court had failed to consider the "ultimate question" set forth in *Miller* -- whether the defendant was irreparably corrupt -- and the record did not answer that question, the appellate court reversed the sentence and remanded the matter for resentencing. Because *Chavez* predates *Montgomery*, it provides no guidance regarding that decision.

Following the completion of briefing, respondent directed our attention to *People v. Blackwell* (2016) 3 Cal.App.5th 166 (*Blackwell*). There, the trial court assessed the *Miller* factors and imposed an LWOP term following a juvenile offender's murder conviction. (*Blackwell, supra,* 3 Cal.App.5th at pp. 173-174.) On appeal, the juvenile offender contended that the absence of jury findings regarding the *Miller* factors contravened *Apprendi v. New Jersey* (2000) 530 U.S. 466, and that the LWOP term constituted cruel and unusual punishment. (*Blackwell, supra,* 3 Cal.App.5th at p. 182.) In rejecting the contention under *Apprendi*, the appellate court concluded that notwithstanding *Montgomery*, a determination that a juvenile offender's crime reflects irreparable corruption
*(Fn. continued on next page.)*

As the trial court resentenced appellant without the benefit of *Montgomery*, it did not examine the *Miller* factors in that manner. In reimposing the LWOP term, the court neither stated that appellant was irreparably corrupt nor made a determination of permanent incorrigibility. Rather, the court focused on the circumstances of the crime, without reference to the evidence bearing on appellant's possibility of rehabilitation. In short, in resentencing appellant, the court did not apply the substantive rule *Montgomery* has now stated *Miller* established.

The remaining issue concerns the appropriate remedy. In view of the evolving standards for sentencing juveniles reflected in *Montgomery*, the parties were not fully apprised in advance of the resentencing hearing of the types of evidence potentially relevant to the trial court's

---

"merely 'encapsulates the [absence] of youth-based mitigation.'" (*Id.* at p. 192.) The appellate court further concluded that the trial court's assessment of the *Miller* factors did not contravene the Eighth Amendment, relying primarily on *Palafox.* (*Blackwell, supra,* at pp. 199-203.)

For the reasons discussed above, we do not find *Blackwell* persuasive on the issues before us. Under *Montgomery*, irreparable corruption requires "permanent incorrigibility," not simply the absence of youth-based mitigation. (*Montgomery*, *supra*, 136 S.Ct. at p. 734.) Furthermore, in view of *Montgomery*, *Palafox* reflects an interpretation of *Miller* that is no longer tenable.

28

determination.  For that reason, we decline to examine whether the evidence before the trial court demonstrated that appellant is not irreparably corrupt, as he contends on appeal.[8]  (*Boyle v. Hawkins* (1969) 71 Cal.2d 229, 232, fn. 3 ["Before an appellate court may make new findings as the basis of a reversal, with directions to enter judgment for appellant . . . 'it must appear from the record . . . that on no theory grounded in reason and justice could the party defeated on appeal make a further substantial showing in the trial court in support of his cause,'" quoting *Tupman v. Haberken* (1929) 208 Cal. 256, 269].)  We therefore remand the matter for resentencing.

---

[8]     Nor do we examine appellant's contention that his LWOP sentence contravenes the prohibition against cruel or unusual punishment in the California Constitution (art. I, sec. 17), as it rests entirely on the same argument.

## DISPOSITION

The order of the court is reversed, and the matter is remanded for further proceedings in accordance with this opinion.

**CERTIFIED FOR PUBLICATION**


MANELLA, J.

We concur:


WILLHITE, Acting P. J.


COLLINS, J.

30