Filed 2/26/20

<u>**CERTIFIED FOR PARTIAL PUBLICATION**</u>[*]

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>JOSE LUIS BOTELLO,<br><br>    Defendant and Appellant. | F076907<br><br>(Super. Ct. No. CRM034457B)<br><br><br>**OPINION** |

APPEAL from a judgment of the Superior Court of Merced County.  Ronald W. Hansen, Judge.

Kyle Gee, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Louis M. Vasquez and William K. Kim, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

Jose Luis Botello was convicted of murdering two juveniles he shot and killed at a party.  The jury found true multiple murder and active gang participation special

---

[*] Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of part I of the Discussion.

circumstances. He was sentenced to serve two consecutive life without the possibility of parole terms.

On appeal, Botello separately challenges his convictions and sentence. He first argues erroneously admitted evidence denied him a fair trial. He then argues the court failed to exercise informed discretion in pronouncing life without parole sentences. We will reverse the judgment and remand for a new sentencing hearing.

## BACKGROUND

Two juveniles were shot and killed during a backyard "high school party."[1] Four eyewitnesses—two near the front yard and two in the backyard—testified at trial.

Before the murders, the two witnesses near the front yard had observed a van drive past multiple times. The van's occupants repeatedly shouted "A-Town." Eventually, the van stopped in front of the party house and two individuals—one wearing a white Oakland Raiders[2] jersey—joined the party for a few minutes before reentering the van. One of the witnesses watched the van park down the road and saw the same two individuals "sn[eaking] [back into the party] through the orchards." Worried the sneaking individuals would "start problems," the vigilant witness "alerted" the second witness to "kick them out." Gunfire rang out moments later.

The two witnesses in the backyard observed the shooting. They identified the shooter as wearing a white Raiders jersey. One of these witnesses specifically identified Botello as the shooter. The other witness saw an "A-Towner" "throw some gang signs, pull out a gun, and shoot two people …." This witness identified Botello as wearing the white Raiders jersey but was not sure he was the shooter.

---

[1] A third person was shot and killed in the front yard. Botello was not charged with any crimes relating to that homicide.

[2] No eyewitness described the jersey as affiliated with the Oakland Raiders, but other evidence established this fact.

Botello admitted attending the party while wearing a white Raiders jersey. Indeed, he was the only person wearing a white Raiders jersey at the party. He further admitted he was a "Sureño," "A-Town" gang member. Botello claimed he was innocent.

A gang expert witness opined A-Town is a criminal street gang aligned with the Sureño "street faction of … the Mexican Mafia." The expert testified A-Towns's primary activities included assaults with or without weapons and murder. The gang "consistently and repeatedly committed these types of crimes." The expert further explained the rivalry between A-Town and other gangs, and the importance to gangs of control, power, territory, and violence.

The expert ultimately offered two opinions. The expert first opined Botello was an A-Town gang member based on Botello's admission, various photographs wherein Botello demonstrates gang signs, Botello's tattoos, and a rap song video in which Botello glorifies gang violence. Second, the expert concluded the murders in this case benefited the A-Town criminal street gang in part because they represent a "willingness" to "eliminate" rival gang members—in this case, one victim was adorned in colors rivaling A-Town—and generally fortifies territory by instilling fear.

**Verdicts and Sentence**

The jury found Botello guilty of two counts of murder with various enhancements and special circumstances.[3] He was sentenced to serve two consecutive life in prison without parole terms.

---

[3] The full convictions follow:

Count One: First degree murder (Pen. Code, § 187, subd. (a)) (unlabeled statutory references are to the Penal Code); enhancement for personally discharging a firearm which caused death (§ 12022.53, subd. (d)); enhancement for committing felony for benefit of criminal street gang (§ 186.22, subd. (b)); special circumstances intentional murder while actively participating in criminal street gang (§ 190.2, subd. (a)(22)); special circumstances multiple murder (§ 190.2, subd. (a)(3)).

**DISCUSSION**

This appeal presents the following questions: Did the trial court prejudicially err in admitting into evidence Botello's rap song video glorifying gang violence? Did the trial court abuse its discretion in sentencing Botello to serve life in prison without the possibility of parole?

We first conclude the court erred by admitting the rap song video into evidence. The error, however, is harmless. Second, we vacate the sentence because we are unable to conclude the trial court's sentence complied with the Eighth Amendment prohibition against cruel and unusual punishments.

## I. Error in Admitting the Rap Video is Harmless

Botello first argues the trial court abused its discretion by allowing the prosecution to introduce into evidence a rap song video depicting Botello glorifying gang-related violence. The People believe the court properly exercised its discretion and, alternatively, any error is harmless. We agree the court abused its discretion by allowing the prosecution to introduce the evidence but find the error harmless.

### A. Additional Background

The prosecution sought to introduce the rap song video under four theories: "Relevant to motive," "Relevant to intent," "Relevant to identity," and "Relevant to the gang enhancement." The court initially stated the song "expresses a clear state of mind and attitude, and I think it's very relevant." The court reserved its ruling and concluded, "I acknowledge it's highly prejudicial. But it's relevant … to the gang issue, but also the state of mind and intent on the homicide itself."

---

Count Two: First degree murder (§ 187, subd. (a)); enhancement for personally discharging a firearm which caused death (§ 12022.53, subd. (d)); special circumstances multiple murder (§ 190.2, subd. (a)(3)).

The following morning, Botello's counsel argued additional points against admissibility.  Because the video was filmed "seven months or eight months after the shooting," it was not relevant to "motive or intent."  The court concluded:

> "[W]ell, obviously the evidence is very relevant.  And so really the only basis for the objection is [Evidence Code section] 352.
>
> "The fact that it's seven months after this incident, I don't find that that is a long period of time.
>
> [¶] … [¶]
>
> "The evidence is directly relevant to the frame of mind, the attitude, the gang culture that the defendant is allegedly steeped in.  And even though it's after the fact and may not be relevant to the possibility of intent or motive as of the date of the shooting, it's very relevant to the gang culture and attitude.
>
> "And although technically not an admission, but it sure shows the willingness to engage in this violent conduct to defend the respect of the gang.  …  The evidence is coming in."

The video was played twice during the trial.

The prosecutor asked the gang expert witness several questions related to the video.  The gang expert testified Botello displayed several "hand signs … showing his allegiance to A-Town Sureños."  The expert also "decipher[ed]" the lyrics for the jury.  The lyrics indicated Botello was "retaliat[ing]" "with a gun" because they "show[] the individual willingness to, you know, commit a crime with the use of a gun.  And it is identifying that something happened.  And in a response, he's going to do something with a gun as a response."

According to the expert, the song "identif[ied] … a form of fear tactic identifying that they're massive killers, meaning they're identifying their willingness to commit crimes all the way up to murder."  The expert defined "dirty work"—a lyric in the song—

5.

to mean " '[w]e're going to commit crimes that need to be committed for the area we represent.' " The lyrics represented a challenge to Norteño rivals and "verbaliz[ed] [a] willingness of criminal behavior …."

The expert further testified the lyrics demonstrate the "willingness to commit criminal activity all the way to death, murder." "It just identifies that [Botello's] willing – the willingness to commit crimes and the level of commitment." The song "clearly" indicates Botello's willingness to shoot rival gang members. It includes multiple challenges demonstrating Botello's willingness to commit more violent crimes than his rivals, including a reference to perpetually carrying a firearm.

The expert ultimately concluded the video

> "clearly identifies [Botello] is a part of A-Town. And through the context of several words, in several different manners, threatens anyone who is willing to challenge him, take him on, and then identifies that he is – in his individual participation challenges a rival or the target of this to basically function, exist, to his level. And then uses in several different ways … he's not fearful of the repercussion. Identifies several times that he has a gun, will use a gun, and will go so far as to commit murder to benefit what it is that he stands for.
>
> "I mean, it's clear based on my training and experience … [Botello] has made the choice to participate in the culture of A-Town Sureños and is willing to commit the most violent of offenses, murder at the direction of, furtherance of, benefit of A-Town Sureños."

The prosecution later referenced the video multiple times in closing argument.

The prosecution[4] first stated Botello "said he was willing to kill for his gang, and he did kill for his gang." The prosecution then asked the jury to acknowledge Botello's "arrogance … and his disregard for human life." Next, echoing the court's jury

---

[4] The Attorney General prosecuted this case. Two separate attorneys presented the People's closing and rebuttal arguments.

6.

instructions, the prosecution reiterated "it would be improper … to find [Botello] guilty just for being a gang member."  The prosecution argued the video supplied "motive" and "answers the why in this case, and that, in turn, helps answer the who …."  Referencing the lyrics, the prosecution finally concluded "[t]he shooter must have been willing to do some dirty work for his gang.  [Botello] said he was willing to kill for his gang and shouted the name of his gang moments before the shooting."

## B. The Trial Court Abused Its Discretion

"[G]ang-related evidence 'creates a risk the jury will improperly infer the defendant has a criminal disposition' and … such evidence should therefore 'be carefully scrutinized by trial courts.' "  (*People v. Mendez* (2019) 7 Cal.5th 680, 691 (*Mendez*).)  "With certain exceptions not relevant here, Evidence Code section 1101, subdivision (a), provides that 'evidence of a person's character'—whether in the form of an opinion, evidence of reputation, or evidence of specific instances of conduct—'is inadmissible when offered to prove [the person's] conduct on a specified occasion.'  This prohibition, however, does not preclude 'the admission of evidence that a person committed a crime, civil wrong, or other act when relevant to prove some fact … other than [the person's] disposition to commit such an act,' including 'motive, opportunity, intent, preparation, [or] plan.' "  (*People v. Valdez* (2012) 55 Cal.4th 82, 129 (*Valdez*).)

"Evidence Code section 352 provides that a court 'in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury.'  We review a trial court's ruling under this section for abuse of discretion and will reverse a trial court's exercise of discretion to admit evidence 'only if "the probative value of the [evidence] clearly is outweighed by [its] prejudicial effect." [Citations.]'  'Prejudice for purposes of Evidence Code section 352 means evidence that tends to evoke an emotional bias against the defendant with very little effect on issues, not evidence that is probative of a

defendant's guilt.' " (*Valdez, supra,* 55 Cal.4th at p. 133.) "The prejudicial effect of evidence … may, of course, outweigh its probative value if it is merely cumulative regarding an issue not reasonably subject to dispute." (*People v. Tran* (2011) 51 Cal.4th 1040, 1049.)

We find the court here abused its discretion for two reasons. First, the trial court, without justification, "assume[d] [the lyrics] relate actual events …." (*People v. Melendez* (2016) 2 Cal.5th 1, 24 [excluding from evidence "mere[] rap lyrics" because no reason to assume their truth].) "Absent some meaningful method to determine which lyrics represent real versus made up events, or some persuasive basis to construe specific lyrics literally, the probative value of lyrics as evidence of their literal truth is minimal." (*People v. Coneal* (2019) 41 Cal.App.5th 951, 968 (*Coneal*).) Reasonable people " 'understand musical lyrics … as the figurative expressions which they are' " and such lyrics " 'are not intended to be and should not be read literally on their face, nor judged by a standard of prose oratory.' " (*In re George T.* (2004) 33 Cal.4th 620, 636-637 (*George T.*).)

Under appropriate circumstances, lyrics may be "probative of their literal truth. For example, where lyrics are written within a reasonable period of time before or after the charged crime and bear a sufficient level of similarity to the charged crime, their probative value as a statement of fact is increased. [Citations.] It may also be that lyrics with sufficient corroboration from other evidence will have increased probative value." (*Coneal, supra,* 41 Cal.App.5th at p. 969, fn. omitted.)

"We do not purport to provide an exhaustive list of factors that may increase the probative value of lyrics as statements of literal fact or intent. It is sufficient that no such factors were present here to increase the probative value of the rap lyrics as evidence" of Botello's gang association, identity, intent, and motive. (*Coneal, supra,* 41 Cal.App.5th at p. 969.) To be sure, there was significant evidence to corroborate the gang association referenced in the lyrics. More directly, this is not a case involving a song which projects

8.

a pure fantasy. But this brings us to the second reason we conclude the court abused its discretion: "[C]orroborating evidence … render[s] the lyrics cumulative." (*Ibid.*)

The lyrics in this case were cumulative to far more persuasive and probative gang-related evidence. Botello himself admitted his gang membership. (See *Arizona v. Fulminate* (1991) 499 U.S. 279, 296 ["A confession is like no other evidence. Indeed, 'the defendant's own confession is probably the most probative and damaging evidence that can be admitted against him.' "].) Multiple eyewitnesses established the shooter was associated with the A-Town gang. The same witnesses provided ample evidence the shooting was gang-related.

The gang expert's opinions rested little on the lyrics. The expert witness generally explained gang motives relative to fear, rivalry, and territory. The expert's opinion that the shooting was gang-related was not based on the lyrics. The opinion was instead based on fear, rivalry, and territory motives.

The expert's opinion that Botello was "an A-Town gang member" was not based on the lyrics. This opinion was instead based on Botello's "associations," "comments," "hand signs" displayed in several photographs, "statements," "tattoos," and various clothing, firearms, and writings depicted in multiple photographs. The expert summarized the photographs provided "several examples of … Botello identifying in various ways, be it selfie-style pictures, writing in the frame of a text, which identify his individual allegiance to Sureños, specifically A-Town Sureños."[5]

To support the video's admissibility the People rely on *People v. Olguin* (1994) 31 Cal.App.4th 1355 (*Olguin*) and *People v. Zepeda* (2008) 167 Cal.App.4th 25 (*Zepeda*). We find these cases distinguishable.

---

[5] As recounted above, the expert later, and separately, testified the rap video impacted his opinion that Botello was a gang member.

*Olguin, supra,* 31 Cal.App.4th 1355 does not discuss whether the rap lyrics were cumulative to other evidence. The opinion found, on one hand, "[g]ang membership was obviously important, and evidence tending to show it was highly relevant," but is devoid of any discussion on the other hand establishing the appellant's gang membership— apparently the lyrics there were the most probative evidence of gang membership. (*Id.* at p. 1373.) The opinion predates by ten years *George T., supra,* 33 Cal.4th 620 which expressed a general presumption against assuming a lyric's truth. In any event, the lyrics in *Olguin, supra,* themselves were self-corroborating. (*Olguin, supra,* 31 Cal.App.4th at p. 1375, fn. 5 ["I'm wanted by the D.A. for committing a crime."].) For these reasons we find *Olguin, supra,* distinguishable.

*Zepeda, supra,* is distinguishable because the court there found the lyrics "provided noncumulative evidence of defendant's state of mind and his gang association differing in context from his tattoos, drawings, notebook, and pictures of himself flashing gang signs." (*Zepeda, supra,* 167 Cal.App.4th at p. 35.) The court concluded the "lyrics, coupled with the other evidence of defendant's gang membership and his animosity towards Sureños, go beyond mere fiction to disclosing defendant's state of mind, his motives and intentions, and his fealty to furthering his criminal gang's activities." (*Ibid.*) We find no such "noncumulative evidence" in this case. For example, unlike Botello, the defendant in *Zepeda* did not confess his gang membership.

We do not suggest a defendant's admission to gang membership renders all other evidence establishing gang membership cumulative. But there is a line to be drawn in each case depending on the facts in each case. That line is not always clear—in fact, it is often blurry—hence the abuse of discretion standard. We simply find the evidence here clearly crossed even a blurry line.

In sum, the "probative value of [the] lyrics as evidence of their literal truth [was] minimal." (*Coneal, supra,* 41 Cal.App.5th at p. 968.) The evidence corroborating the video's violent expressions was scant. The probability of prejudice was dangerously

10.

high.  The expert, believing the lyrics were true, testified the rap song established Botello's gang membership and willingness to murder despite no rational basis for this belief.[6]  That irrational belief is the exact prejudice section 352 seeks to avoid.  Trial courts must " 'carefully scrutinize[]' " gang-related evidence because of the " 'risk the jury will improperly infer the defendant has a criminal disposition ….' " (*Mendez, supra,* 7 Cal.5th at p. 691.)

The lyrics themselves were entirely cumulative to other evidence and were meaningless in contrast to evidence describing general gang-related motives and themes, the gang's "consistent[] and repeated[]" commission of violent assaults and murders, and Botello's self-admitted gang membership.  The " 'prosecution has no right to present cumulative evidence which creates a substantial danger of undue prejudice to the defendant.' " (*People v. Cardenas* (1982) 31 Cal.3d 897, 905.)  Accordingly, we find the trial court abused its discretion by admitting the audio and lyrics in evidence.[7]  We turn next to examine the prejudice.

### C. The Erroneously Admitted Evidence Was Harmless

"When evidence is erroneously admitted, we do not reverse a conviction unless it is reasonably probable that a result more favorable to the defendant would have occurred absent the error." (*People v. Powell* (2018) 5 Cal.5th 921, 951.)  Applying that standard leads us to conclude the error here was harmless.

---

[6] Our decision finding an abuse of discretion is not based on testimony presented at trial.  We find an abuse of discretion because the lyrics were cumulative to other evidence and the high probability the jury would conflate Botello's expressed penchant to commit *gang-related* murders with a *general* propensity to murder.  The expert's testimony simply ignited this probability.  Courts must carefully weigh gang-related evidence because a *gang-related* motive to commit *nonspecific* crimes blurs the line between motive and propensity.  (See *Mendez, supra,* 7 Cal.5th at p. 691.)

[7] We note that our conclusion is that the audio and lyrics, not the video itself, were unduly prejudicial.

Multiple eyewitnesses in this case described the shooter as wearing a white Raiders jersey. Two eyewitnesses identified Botello's presence at the party—one specifically identified him as the shooter. The other eyewitness placed Botello at the shooting but was unclear as to his role. All eyewitness accounts corroborated each other and established two individuals associated with the A-Town gang, one wearing a Raiders jersey, snuck into the party, confronted the victims, and then fired multiple gunshots.

Botello's admission to A-Town gang membership and wearing a white Raiders jersey to the party materially and substantially corroborated the eyewitnesses. In short, the evidence painted one picture: Botello was the shooter. Because the rap lyrics were unnecessary to paint that picture, there is no reasonable probability for a more favorable result absent the error. We reject his contrary claim.

**II. The Eighth Amendment Commands Strict Compliance for Juvenile Life Without Parole Sentencing; the Sentence is Vacated and We Remand for a New Sentencing Hearing**

Botello believes the trial court abused its discretion in sentencing him to serve life without parole in prison. Specifically, he contends "the trial court failed to recognize and apply the correct legal standard to its [sentencing] decision." He further asserts trial courts must find "irreparable corruption resulting in permanent incorrigibility" prior to imposing life without parole sentences on juvenile offenders.

The People only argue section 3051, subdivision (b)(4), which affords juveniles sentenced to life without parole an opportunity to parole after incarceration for 25 years, moots his contention. Before we address the issues, we provide a brief overview to frame them in context.

The United States Supreme Court confronted mandatory life without parole sentences for juveniles in *Miller v. Alabama* (2012) 567 U.S. 460 (*Miller*). The Court held the Eighth Amendment demands "individualized sentencing … before imposing the harshest possible penalty for juveniles." (*Id*. at p. 489.) By "tak[ing] into account how

12.

children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison," individualized sentencing "distinguish[es] … between 'the juvenile offender whose crime reflects unfortunate yet transient immaturity, and the rare juvenile offender whose crime reflects irreparable corruption.' " (*Id.* at pp. 479-480.)

In *Montgomery v. Louisiana* (2016) 577 U.S. __ [136 S.Ct. 718] (*Montgomery*), the Court held *Miller, supra,* 567 U.S. 460 applied retroactively. Retroactivity, however, "does not require States to relitigate sentences, let alone convictions, in every case where a juvenile offender received mandatory life without parole. A State may remedy a *Miller* violation by permitting juvenile homicide offenders to be considered for parole, rather than by resentencing them." (*Montgomery, supra,* 577 U.S. at p. __ [136 S.Ct. at p. 736].)

As a result, California enacted section 3051, subdivision (b)(4). This statute "avoid[s] the *Miller* issues associated with" sentences pronounced prior to *Miller*. (*In re Kirchner* (2017) 2 Cal.5th 1040, 1054-1055.)

Our analysis proceeds in the following manner: First, we determine section 3051, subdivision (b)(4), does not moot Botello's abuse of discretion claim. Next, we examine and illuminate the transient immaturity versus irreparable corruption legal standard applicable to juvenile life without parole sentencing. We conclude, to faithfully apply this deeply rooted in the Eighth Amendment sentencing standard, a trial court must affirmatively and expressly find the circumstances justify imposing a life without parole sentence upon a juvenile offender.

Finally, we vacate Botello's sentence because we cannot determine from the record whether the trial court applied the correct sentencing standard. *Miller* and *Montgomery* demand clear answers to complex questions. Mindful of this dichotomy, we will offer some general guidance to promote clear answers in our trial courts.

13.

## A. The Abuse of Discretion Claim is not Moot

Botello argues his abuse of discretion claim is not moot for two reasons. First, a life without parole sentence triggers "disadvantageous collateral consequences." (See *People v. DeLeon* (2017) 3 Cal.5th 640, 645-646.) He identifies in his briefing several such consequences including access to "rehabilitative programs," "severe movement and time-of-day restrictions," limited access to vocational training which in turn limits the ability to demonstrate parole suitability, "hous[ing]" accommodations, and denial of "compassionate medical release …." (See generally Cal. Code Regs., tit. 15, § 3375 et seq.; *People v. Scott* (2016) 3 Cal.App.5th 1265, 1273-1274 ["LWOP prisoners are, for example, foreclosed from vocational training or other programs and rehabilitative services that are available to other prisoners."].)

Second, Botello correctly points out that the sentences underlying section 3051's protections "*remain valid*" because those protections are designed to avoid "the *Miller* issues associated with the earlier sentences." (*In re Cook* (2019) 7 Cal.5th 439, 448-449 [§ 3051, subd. (b)(4) enacted to implement *Montgomery* and *Miller*].) He argues that (1) if the underlying sentences *"remain valid,"* and (2) if section 3051 is aimed at juvenile offenders sentenced before *Miller*, then he is entitled to a validly imposed sentence because section 3051 is not designed to protect against his life without parole sentence. In other words, if section 3051 is amended or repealed in the future, then he must serve life without parole because his sentence remains valid.

The People argue the exact opposite, i.e., section 3051 moots this claim. The People are incorrect. Section 3051, subdivision (b)(4), moots a constitutional challenge to a life without parole sentence. (*People v. Franklin* (2016) 63 Cal.4th 261, 286 (*Franklin*) ["Franklin's Eighth Amendment challenge to his original sentence has been rendered moot."].) It does not moot Botello's abuse of discretion challenge.

In general, courts must decide only " ' "actual controversies by a judgment which can be carried into effect …." ' " (*In re Arroyo* (2019) 37 Cal.App.5th 727, 732

14.

(*Arroyo*).) Courts may not " ' "give opinions upon moot questions or abstract propositions, or … declare principles or rules of law which cannot affect the matter in issue in the case before it." ' " (*Ibid.*) " ' "[A] case becomes moot when a court ruling can have no practical impact or cannot provide … effect[ive] relief." ' " (*Ibid.*)

The question presented here is not moot for two reasons. First, an ultimate sentence less than life without parole would ameliorate Botello's concern with "disadvantageous collateral consequences."

Second, ensuring that sentences are constitutionally imposed *in the first instance* protects against any future modification to section 3051's applicability to juveniles in Botello's position, i.e., juveniles sentenced to life without parole after *Miller, supra.*[8] The People's argument allows trial courts to entirely ignore *Miller, supra,* 567 U.S. 460 and instead allow the Legislature to mete justice. Such a position is untenable. We turn next to the merits.

## B. The Irreparable Corruption and Permanent Incorrigibility Standard

To help appreciate and understand the true sentencing standard we first recite recent juvenile Eighth Amendment precedent. "The Eighth Amendment prohibition on cruel and unusual punishment 'guarantees individuals the right not to be subjected to excessive sanctions.' " (*Franklin, supra,* 63 Cal.4th at p. 273.) "This prohibition encompasses the 'foundational principle' that the 'imposition of a State's most severe penalties on juvenile offenders cannot proceed as though they were not children.' " (*Ibid.*)

The United States Supreme Court squarely addressed life without parole sentences for juvenile homicide offenders in *Miller, supra,* 567 U.S. 460. "Because juveniles have

---

[8] We do not decide whether modifying or rescinding section 3051's protections would violate the Constitution. That question is not ripe for decision. We simply note Botello's argument presents an " ' "actual controvers[y]" ' " in which our ruling can " ' "provide … effect[ive] relief." ' " (*Arroyo, supra,* 37 Cal.App.5th at p. 732.)

diminished culpability and greater prospects for reform, … 'they are less deserving of the most severe punishments.' " (*Id.* at p. 471.)

"[C]hildren have a ' "lack of maturity and an underdeveloped sense of responsibility," ' leading to recklessness, impulsivity, and heedless risk-taking. [Citation.] … [C]hildren 'are more vulnerable … to negative influences and outside pressures,' including from their family and peers; they have limited 'contro[l] over their own environment' and lack the ability to extricate themselves from horrific, crime-producing settings." (*Miller, supra,* 567 U.S. at p. 471.) A child's "traits are 'less fixed' and his [or her] actions less likely to be 'evidence of irretrievabl[e] deprav[ity]." (*Ibid.*)

"[T]he distinctive attributes of youth diminish the penological justifications for imposing the harshest sentences on juvenile offenders, even when they commit terrible crimes. Because ' "[t]he heart of the retribution rationale" ' relates to an offender's blameworthiness, ' "the case for retribution is not as strong with a minor as with an adult." ' [Citations.] Nor can deterrence do the work in this context, because ' "the same characteristics that render juveniles less culpable than adults" '—their immaturity, recklessness, and impetuosity—make them less likely to consider potential punishment. [Citation.] … Deciding that a 'juvenile offender forever will be a danger to society' would require 'mak[ing] a judgment that [he or she] is incorrigible'—but ' "incorrigibility is inconsistent with youth." ' " (*Miller, supra,* 567 U.S. at pp. 472-473.)

"[F]or the same reason, rehabilitation could not justify that sentence. Life without parole 'forswears altogether the rehabilitative ideal.' [Citation]. It reflects 'an irrevocable judgment about [an offender's] value and place in society,' at odds with a child's capacity for change." (*Miller, supra,* 567 U.S. at p. 473.)

"Life-without-parole terms … 'share some characteristics with death sentences that are shared by no other sentences.' [Citation.] Imprisoning an offender until he dies alters the remainder of his life 'by a forfeiture that is irrevocable.' [Citation.] And this lengthiest possible incarceration is an 'especially harsh punishment for a juvenile,'

16.

because he [or she] will almost inevitably serve 'more years and a greater percentage of his [or her] life in prison than an adult offender.' [Citation.] The penalty when imposed on a teenager, as compared with an older person, is therefore 'the same … in name only.' " (*Miller, supra,* 567 U.S. at pp. 474-475.) For this reason, "this ultimate penalty for juveniles [i]s akin to the death penalty …."**[9]** (*Id*. at p. 475.)

For these reasons, the Court required "a sentencer" to consider youth "and its hallmark features" prior to imposing life without parole on a juvenile offender. (*Miller, supra,* 567 U.S. at pp. 476-480.) The Court broadly identified five categories or factors to consider: (1) "immaturity, impetuosity, and failure to appreciate risks and consequences."; (2) "family and home environment that surrounds him [or her]—and from which [a juvenile] cannot usually extricate himself [or herself]"; (3) "the circumstances of the homicide offense, including the extent of … participation in the conduct and the way familial and peer pressures may have" contributed; (4) how "incompetencies associated with youth" may have impacted the charges and convictions; and (5) "the possibility of rehabilitation." (*Id*. at pp. 477-478.)

"But given … children's diminished culpability and heightened capacity for change," the Court concluded "appropriate occasions for sentencing juveniles to this harshest possible penalty will be uncommon. *That is especially so because of the great difficulty … of distinguishing at this early age between 'the juvenile offender whose crime reflects unfortunate yet transient immaturity, and the rare juvenile offender whose crime reflects irreparable corruption.'* … [W}e do not foreclose a sentencer's ability to make *that judgment* in homicide cases, [but] we require it to take into account how children are different, and how those differences counsel against irrevocably sentencing them to a

---

**[9]** Life without parole is the "ultimate penalty for juveniles" because "no individual may be executed for an offense committed when he or she was a juvenile …." (*Franklin, supra,* 63 Cal.4th at p. 274.)

17.

lifetime in prison." (*Miller, supra,* 567 U.S. at pp. 479-480, fn. omitted, emphasis added.)

In *Montgomery, supra,* 577 U.S. __ [136 S.Ct. 718], the Court explained that "*Miller* … did more than require a sentencer to consider a juvenile offender's youth before imposing life without parole; it established that the penological justifications for life without parole collapse in light of 'the distinctive attributes of youth.' [Citation.] *Even if a court considers a child's age before sentencing him or her to a lifetime in prison, that sentence still violates the Eighth Amendment for a child whose crime reflects ' "unfortunate yet transient immaturity." '* [Citation.] Because *Miller* determined that sentencing a child to life without parole is excessive for all but ' "the rare juvenile offender whose crime reflects irreparable corruption," ' [citation], it rendered life without parole an unconstitutional penalty for 'a class of defendants because of their status'—that is, juvenile offenders whose crimes reflect the transient immaturity of youth." (*Id.* at p. __ [136 S.Ct. at p. 734], emphasis added.)

In sum, "*Miller* did bar life without parole … for all but the rarest of juvenile offenders, those whose crimes reflect permanent incorrigibility." (*Montgomery, supra,* 577 U.S. at p. __ [136 S.Ct. at p. 734].) "Before *Miller*, every juvenile convicted of a homicide offense could be sentenced to life without parole. After *Miller*, it will be the rare juvenile offender who can receive that same sentence." (*Ibid.*) "The question is whether [a juvenile offender] can be deemed, at the time of sentencing, to be irreparably corrupt, beyond redemption, and thus unfit ever to reenter society, notwithstanding the 'diminished culpability and greater prospects for reform' that ordinarily distinguish juveniles from adults." (*People v. Gutierrez* (2014) 58 Cal.4th 1354, 1391.)

Distinguishing between juvenile offenders "whose crimes reflect transient immaturity and those rare children whose crimes reflect irreparable corruption" or "permanent incorrigibility" is constitutionally imperative. (*Montgomery, supra,* 577 U.S. at p. __ [136 S.Ct. at p. 734].) To properly implement this constitutional mandate, we

18.

conclude trial court judges must expressly find "irreparable corruption" or "permanent incorrigibility" prior to imposing life without parole sentences upon juvenile offenders. (*Ibid*.; *People v. Padilla* (2016) 4 Cal.App.5th 656, 673 (*Padilla*) ["trial court must assess the *Miller* factors with an eye to making an express determination whether the juvenile offender's crime reflects permanent incorrigibility arising from irreparable corruption."].)

While the People do not directly address the question underlying our conclusion, Botello identifies two cases potentially at odds with our conclusion. These cases merit discussion.

First, in *People v. Palafox* (2014) 231 Cal.App.4th 68, this court upheld a juvenile's life without parole sentence where the trial court "implicitly concluded defendant was unfit ever to reenter society." (*Id*. at p. 91.) The *Palafox* opinion relied heavily on the fact the *Miller* court declined to hold "LWOP categorically unconstitutional for juvenile offenders, or at least … [declined to] explicitly [announce] such a sentence cannot constitutionally stand in [the] face of a potential for rehabilitation." (*Palafox,* at p. 90.) This basis predates, and is directly at odds with, *Montgomery*'s explication that "*Miller* did bar life without parole … for all but the rarest of juvenile offenders, those whose crimes reflect permanent incorrigibility." (*Montgomery, supra,* 577 U.S. at p. __ [136 S.Ct. at p. 734].)

The next case, *People v. Blackwell* (2016) 3 Cal.App.5th 166, held a judge may sentence a juvenile to life without parole in prison without violating the Sixth Amendment right to trial by jury. (*Id*. at pp. 186-188; see generally *Apprendi v. New Jersey* (2000) 530 U.S. 466 [explaining right to jury trial as it relates to sentencing].) *Blackwell* further concluded *Miller* did "*not* require a finding of fact regarding a child's incorrigibility or irrevocable corruption." (*Blackwell,* at p. 192.) In so concluding, *Blackwell* declares " 'irreparable corruption' is not a factual finding, [it] merely 'encapsulates the [absence] of youth-based mitigation.' " (*Ibid*.)

19.

We respectfully disagree. *Miller*'s paradigmatic approach encapsulates much more than youth-based mitigation. (*Montgomery, supra,* 577 U.S. at p. __ [136 S.Ct. at p. 734].) The Court clearly announced, "*Even if a court considers a child's age before sentencing him or her to a lifetime in prison, that sentence still violates the Eighth Amendment for a child whose crime reflects ' "unfortunate yet transient immaturity." ' "* (*Ibid.*, emphasis added.) "*Miller* did not merely impose an 'individualized sentencing requirement'; it imposed a substantive rule that life without parole is only an appropriate punishment for 'the rare juvenile offender whose crime reflects irreparable corruption.' " (*Adams v. Alabama* (2016) 136 S. Ct. 1796, 1799, Sotomayor, J. concurring in decision to grant writ, vacate judgment, and remand case, quoting *Montgomery, supra*; *Padilla, supra,* 4 Cal.App.5th at p. 673, fn. 7.) *Blackwell*'s "youth-based mitigation" metric is irreconcilable with *Montgomery*.

We acknowledge *Miller* itself did not impose a formal factfinding requirement. (*Montgomery, supra,* 136 S. Ct. at p. 735.) But the Supreme Court specifically declined to impose such a finding out of "[f]idelity to … federalism …." (*Ibid.*) The "Court [was] careful to limit the scope of any attendant procedural requirement [to its Eighth Amendment holding] to avoid intruding more than necessary upon the States' sovereign administration of their criminal justice systems." (*Ibid.*) "That *Miller* did not impose a formal factfinding requirement does not leave States free to sentence a child whose crime reflects transient immaturity to life without parole. To the contrary, *Miller* established that this punishment is disproportionate under the Eighth Amendment." (*Ibid.*) For these reasons, we maintain a formal finding is necessary to faithfully administer *Miller* and *Montgomery*.

Three reasons underpin our conclusion. First, a formal finding ensures compliance with the rigorous Eighth Amendment standards pronounced by the United States Supreme Court. Second, requiring trial courts to state their logic on the record imposes no additional burden because they are already required to determine "at the time

of sentencing [whether a juvenile offender is] irreparably corrupt, beyond redemption, and thus unfit ever to reenter society" prior to sentencing a juvenile offender to life without parole.  (*Gutierrez, supra,* 58 Cal.4th at p. 1391.)  There is simply no reason to permit implicit compliance.  There is, however, a vital reason to demand express compliance, which brings us to our third reason.

A formal finding of irreparable corruption or permanent incorrigibility guarantees meaningful appellate review.  (See *People v. Elliott* (2012) 53 Cal.4th 535, 595 ["Under the due process and equal protection clauses of the federal Constitution's Fourteenth Amendment, and under state law, a criminal defendant is entitled to an appellate record that is 'sufficient to permit adequate and effective appellate review.' "].)  The pronounced judgment in this case amply illustrates the need for detailed, explicit, and precise sentencing in the juvenile life without parole context.

## C. Applying *Miller* and *Montgomery* to This Case

To recap, Botello argues the trial court "failed to recognize and apply the correct legal standard to its discretion."  The People simply argue the issue is moot and do not directly address the point other than to note "the court considered the youth-related factors set forth in *Miller*, [and] was unwilling to decide whether Botello's murders … showed irreparable corruption."  The record leaves us unable to determine if the court applied the correct legal standard.  Accordingly, we will vacate the sentence.

### i. Additional Background

The court commenced the sentencing hearing by acknowledging "the top end of the sentence is sentenced to life without the possibility of parole.  Based on the special circumstances, the Court has discretion with respect to various other alternatives."

Botello's attorney then informed the court they would like to submit a transcript of the juvenile court transfer hearing testimony to aid in Botello's eventual Penal Code

section 3051 parole hearing.[10]  That transcript contained no less than four direct expressions that Botello "is probably going to be successful in treatment or rehabilitation."[11]

Next, the prosecution, after presenting two emotionally powerful victim impact statements, argued "[t]his was an execution."  Referring to the rap video, the prosecution stated, "the video clearly shows [Botello] for what he is….  There is not one hint of remorse in that video for taking two innocent human lives.  If anything, the defendant brags, talks about killing, and this is after he's already committed these callous crimes."

While recognizing section 3051's applicability to the ultimate outcome, the prosecution concluded, "Nonetheless, it's the role of this Court, as the Court knows, regardless of what the [L]egislature decrees is going to happen in the future, it's the role of this Court to today to impose a just sentence.  And the People would urge this Court that in this case … the maximum sentence is the appropriate sentence."

Botello's attorney asked "the Court to use its discretion" and acknowledged the court "does not have to sentence Mr. Botello to life without parole."  The attorney urged the court "to consider something other than life without parole."

In pronouncing judgment, the trial court stated,

> "I have considered Mr. Botello's age at the time the crime was committed.  He was just three or four months shy of 18 years of age. …

---

[10] The juvenile court judge was not the trial court judge.

[11] The record does not indicate the trial court read the transcript or was otherwise aware of its content prior to pronouncing judgment.  We note this testimony not because we find it determinative—credibility and weight are for the trial court to determine—but rather because it indicates the court did not fully engage in the process *Miller* and *Montgomery* elucidate.

22.

"Now the only information I have about his family environment is nothing significant. … There was no father influence in his upbringing, at least that the Court is aware of.

"And then I focus on the nature of these offenses. These were two murders that were callous, calculated, and, I agree with the prosecution, that it amounted to an execution …

[¶] … [¶]

"So those are the comments that I have regarding Mr. Botello with respect to his future.

"As to whether or not he can rehabilitate, I just can't make that prediction for anyone. You know, people can change, but – so to make that prediction today, I think, is unfair. The parole board should have to make that assessment after 25 years of imprisonment.

"But I do make the comments about the nature of this offense and the circumstances on which it occurred and the glorification that he made of it in his rap video."

The court subsequently imposed two consecutive life without parole sentences.

### ii. Analysis

" 'Defendants are entitled to sentencing decisions made in the exercise of the "informed discretion" of the sentencing court.' " (*Gutierrez, supra,* 58 Cal.4th at p. 1391.) "[A]n abuse of discretion arises if the trial court based its decision on impermissible factors [citation] or on an incorrect legal standard." (*People v. Knoller* (2007) 41 Cal.4th 139, 156.) " ' "Failure to exercise a discretion conferred and compelled by law constitutes a denial of a fair hearing and a deprivation of fundamental procedural rights, and thus requires reversal." ' " (*People v. Leon* (2016) 243 Cal.App.4th 1003, 1023 (*Leon*).) "[T]he appropriate remedy is to remand for resentencing unless the record 'clearly indicate[s]' that the trial court would have reached

the same conclusion" had it faithfully discharged its duty. (*Gutierrez, supra,* 58 Cal.4th at p. 1391.)

Unfortunately, we are unable to determine whether the trial court properly applied *Miller* and *Montgomery.* The record undoubtedly demonstrates the court was aware of its discretion to impose a sentence other than life without parole. The court clearly considered Botello's age and certainly felt the circumstances of the offense were egregious. But "[t]he record in this case does not reflect that the sentencing court ever considered 'the ultimate question posed by the courts in both *Miller* and *Gutierrez, ...*: Did th[is] crime[ ] reflect transient immaturity or irreparable corruption?' " (*In re Berg* (2016) 247 Cal.App.4th 418, 431 (*Berg*).) The record contains no clear indication the court "deemed [Botello], at the time of sentencing, to be irreparably corrupt, beyond redemption, and thus unfit ever to reenter society, notwithstanding the 'diminished culpability and greater prospects for reform' that ordinarily distinguish juveniles from adults." (*Gutierrez, supra,* 58 Cal.4th at p. 1391.)

To the contrary, the court specifically stated, "whether or not he can rehabilitate, I just can't make that prediction for anyone. You know, people can change, but – so to make that prediction today, I think, is unfair." It is unclear whether the court's comment is addressing a singular factor for consideration or whether the court is declining to answer the ultimate question. On one hand the statement strongly indicates, as the People put it, the court "was unwilling to decide whether Botello's murders … showed irreparable corruption." The statement is also, on the other hand, conceivably consistent with a less than artful articulation that Botello is irreparably corrupt while simultaneously acknowledging a philosophical or theoretical principle that "people can change …."[12]

---

[12] As noted, the record contains direct testimony relating to Botello's rehabilitative prospects. The record does not indicate the sentencing court engaged this testimony. Again, it is for the trial court, not this court, to assess the testimony's credibility and weight. We sympathize with the trial court expressing its frustration and acknowledge the "great difficulty … of distinguishing at this early age between 'the juvenile offender

This record leaves us unable to conclude "that the trial court would have [impos]ed the same" sentence had it diligently applied *Miller* and *Montgomery*. (*Gutierrez, supra,* 58 Cal.4th at p. 1391.) Consequently, we will remand for resentencing.

### D. Considerations Moving Forward

Like both the trial court here and the United States Supreme Court, we recognize the "great difficulty" these sentencing decisions present. (*Miller, supra,* 567 U.S. at p. 479.) To help ease this difficulty, we offer a few suggestions and highlight a few tools to assist trial courts. By no means are these suggestions or tools comprehensive or exclusive.

In each case the trial court will have at its disposal "the probation officer['s] … report on the behavioral patterns and social history of the" juvenile offender. (Welf. & Inst. Code, § 707, subd. (a)(2).) The court will also have at its disposal the "probation officer['s] … report … upon the circumstances surrounding the crime and the prior history and record of the" juvenile offender. (§ 1203, subd. (b)(1).) These reports will provide some insight into two fruitful and important areas: Prior rehabilitative efforts and social structure.

Prior rehabilitative efforts may present in two ways. First, juvenile and criminal history may disclose an individual's previous success in completing rehabilitative

---

whose crime reflects unfortunate yet transient immaturity, and the rare juvenile offender whose crime reflects irreparable corruption.' " (*Miller, supra,* 567 U.S. at p. 480.) For this exact reason the Court believed such sentences would be "rare" and "uncommon." (*Ibid.*)

Nonetheless, trial courts may not refuse to comply with *Miller* and *Montgomery* by instead asking "[t]he parole board … to make that assessment after 25 years of imprisonment." Indeed, such a refusal is incompatible with precedent because juvenile offenders are entitled to a validly imposed sentence "*at the outset.*" (*Gutierrez, supra,* 58 Cal.4th at pp. 1386-1387.)

programs. Of course, repeated delinquency and criminality, and any escalating behavior, might reveal prior success failed to bear actual fruit. Second, the absence of any history is itself evidence of rehabilitative potential. The proper inference in any given case is appropriately left to the trial court's sound discretion.

An individual's social structure may shed light on the potential for rehabilitation. A court might find a strong social structure signals a higher chance for rehabilitation. For example, actively involved parents, siblings, and friends may improve an offender's prospects. The absence of such a structure may reduce such prospects or, on the other hand, indicate transient immaturity. Again, the appropriate inference is for the trial court to determine.

Of course, we strongly emphasize potential inferences are simple to state but in reality highly complex to correctly identify. To this end, expert testimony presented on the issue of potential rehabilitation may prove valuable. Such expert testimony may be presented by the People, the juvenile offender, or both. The court itself may find expert testimony necessary to aid its ultimate decision. The court may, in the absence of or in addition to any expert testimony on the topic, appoint an expert to conduct a specific evaluation. (*People v. Stuckey* (2009) 175 Cal.App.4th 898, 913 ["the court always has the power to appoint its own experts to assist the court, if the need arises."]; *Rutherford v. Owens-Illinois, Inc.* (1997) 16 Cal.4th 953, 967 [describing a court's inherent powers].)

A court may also find it appropriate "that a just disposition of the case requires such diagnosis and treatment services as can be provided at a diagnostic facility of the Department of Corrections, may order that defendant be placed temporarily in such facility for a period not to exceed 90 days, with the further provision in such order that the Director of the Department of Corrections report to the court his diagnosis and recommendations concerning the defendant within the 90-day period." (§ 1203.03, subd. (a).) Then, "[t]he Director of the Department of Corrections shall, within the 90 days, cause defendant to be observed and examined and shall forward to the court his

diagnosis and recommendation concerning the disposition of defendant's case. Such diagnosis and recommendation shall be embodied in a written report ...." (*Id.*, at subd. (b).)

Courts should also consider evidence evincing remorse or lack thereof. Lack of remorse in one case might rightfully favor incorrigibility, and in another case it might indicate transient immaturity. Again, the appropriate inference is best left to the trial court's sound discretion.

Finally, courts should consider evidence of actual rehabilitation. Actual, self reflective rehabilitative efforts are important. This is especially true when several years have passed between the crime and the sentencing hearing. This may occur due to delays within the criminal justice system, or delays in establishing the juvenile offender's identity.

In either situation, but especially the latter, courts should carefully note the juvenile offender's education, rehabilitative efforts, and work history as it relates to his or her future prospects. The court should also consider whether the juvenile offender has children or a partner or spouse. These circumstances may signal rehabilitative potential.

Our hope is that trial courts may find these suggestions beneficial. We reiterate these suggestions are by no means comprehensive or exclusive. In an adversarial system, the possibilities are curtailed only by the limits of imagination.

## CONCLUSION

Commitment to the Eighth Amendment cannot rest on beleaguered attempts to reconstruct a potentially implicit rationale underlying life without parole sentences. We cannot divine a court's logic or reason if we are unsure what question, if any, the court is answering. Permitting implied compliance with this constitutional mandate invites unwarranted conjecture and hypothesis into " 'an irrevocable judgment about [a juvenile offender's] value and place in society ....' " (*Miller, supra,* 567 U.S. at p. 473.) Because

such judgments are "akin to the death penalty," the stakes are too high for assumptions. (*Id.* at p. 475.)

Explicit compliance with *Miller* and *Montgomery* precludes speculation and promotes judicial economy by facilitating meaningful appellate review. The appropriate remedy here is to vacate the sentence and remand to the trial court for a clear and reasoned pronouncement of judgment, including an express answer to "the ultimate question posed by the courts in both *Miller* and *Gutierrez,* ...: Did th[ese] crime[s] reflect transient immaturity or irreparable corruption?" (*Berg, supra,* 247 Cal.App.4th at p. 431; *Gutierrez, supra,* 58 Cal.4th at p. 1391; *Padilla, supra,* 4 Cal.App.5th at p. 673.)

## DISPOSITION

The judgment is reversed. We remand to the trial court to conduct a new sentencing hearing in explicit compliance with *Miller, Montgomery,* and this opinion.[13]

_____
                                                          SNAUFFER, J.

WE CONCUR:


_____
FRANSON, Acting P.J.


_____
SMITH, J.

---

[13] We note the trial court failed to award custody credits at sentencing. The abstract of judgment mirrored this failure. Any subsequently pronounced judgment shall appropriately award custody credits.

28.