Filed 9/3/24  P. v. Wilson CA2/1
Opinion following transfer from Supreme Court

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>KENNETH MICHAEL WILSON et al.,<br><br>    Defendants and Appellants. | B322501<br><br>(Riverside County<br>Super. Ct. No. INF1500163) |

        APPEAL from judgment of the Superior Court of Riverside County, Johnnetta E. Anderson, Judge.  Affirmed as modified.
        Patricia Ihara; Appellate Defenders, Inc., and Howard C. Cohen, under appointments by the Court of Appeal, for Defendant and Appellant Kenneth Michael Wilson.
        Allen G. Weinberg, under appointment by the Court of Appeal, for Defendant and Appellant Jesse Keith Cottom.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, A. Natasha Cortina, Annie Featherman Fraser and Alan Amann, Deputy Attorneys General, for Plaintiff and Respondent.

————————————————

This case is before us on remand from the California Supreme Court. Pursuant to the court's instructions, we are to vacate our previous opinion in this case and reconsider the cause in light of *People v. Hardin* (2024) 15 Cal.5th 834 (*Hardin*). We do so and, on reconsideration, affirm the judgment of the superior court as modified.[1]

In January 2015, appellant Kenneth Michael Wilson, his brother Wayne Wilson, and Jesse Keith Cottom planned to sell fake cocaine to an acquaintance. This ultimately resulted in Cottom fatally shooting the acquaintance in the neck. At the

---

[1] Our initial opinion addressed two judgments of conviction: one regarding then-appellant Jesse Cottom and one involving appellant Kenneth Wilson. Both Cottom and Wilson filed petitions for review with the California Supreme Court. In a single order, the Supreme Court granted Wilson's petition, but denied Cottom's petition. Therefore, on December 7, 2023, this court issued the remittitur in Cottom's case, at which point our original opinion "bec[a]me final as to appellant Jesse K Cottom only." Thus, our vacatur of the original opinion has no effect the disposition of Cottom's appeal, nor does the instant opinion address Cottom's appeal.

time of the incident, Wilson[2] was 20 years old. A jury convicted Wilson and Cottom of felony murder and attempted robbery.

Wilson contends that: (1) substantial evidence does not support that he acted with the "reckless indifference to human life" necessary to support the felony murder conviction;[3] (2) the trial court reversibly erred in admitting evidence of his involvement in a later, unrelated robbery to prove intent to rob in the instant case; (3) Penal Code section 3051, subdivision (h)[4] violates equal protection because it denies youth offender parole hearings to those who committed life without parole (LWOP) offenses while between the ages of 18 and 25 years (see § 3051, subds. (b)(4) & (h)); (4) one of the statutes under which he was sentenced (§ 190.5) violates his right to equal protection; (5) taken together, the statutes under which he was sentenced (§§ 190.2 & 190.5) violate constitutional prohibitions against cruel and unusual punishment; and (6) as applied, his LWOP sentence is cruel and unusual because it is disproportionate to his culpability. None of these arguments warrants relief on appeal.

---

[2] To avoid confusion, we refer to Kenneth Wilson by his surname and to Wayne Wilson as "Wilson's brother."

[3] Wilson does not challenge that substantial evidence supports he was a major participant in the robbery. (See § 189, subd. (e)(3) [defining applicable version of first degree felony murder as requiring both that the defendant "was a major participant in the underlying felony and acted with reckless indifference to human life"].)

[4] Unless otherwise indicated, all further statutory references are to the Penal Code.

3

We agree, however, with both Wilson and the People that the restitution order should be modified. Accordingly, we affirm the judgment as modified to reflect this change.[5]

## FACTS AND PROCEEDINGS BELOW

### A.     Background:  Individuals and Witnesses Involved

In 2019, the Riverside County District Attorney charged Wilson and Cottom with first degree felony murder and attempted robbery.  Both counts also alleged that Cottom personally discharged a weapon causing death (§ 12022.53, subd. (d)), and that Wilson was a principal armed with a firearm (§ 12022, subd. (a)(1)).

The events relevant to these charges involved a group of adolescent males, comprised of then 20-year-old Wilson, Wilson's older brother, Wilson's neighbors Miguel "Mike" Ramirez and his brother Lorenzo Ramirez, then 17-year-old Cottom, and Cottom's younger brother Justin Cottom.  Around the time of the crimes at issue (January 2015), this group regularly gathered in the driveway of the Ramirez brothers' home in La Quinta Cove, which was across the street from the Wilson brothers' home.  There were surveillance cameras on the Ramirez brothers' home.

---

[5] We also agree with Wilson and the People that he was entitled to custody credits he did not receive.  Given that we affirm his LWOP sentence, however, we decline to modify the judgment in this respect.

Adrian Vivas and Bradley Olds also had been part of this group at one point, and occasionally joined the others in front of the Ramirez brothers' home.

Dylan Sniffin, a friend of Vivas's who lived outside La Quinta Cove, was acquainted with Cottom and Mike Ramirez from juvenile hall. His cousin, Ryan Sniffin, is the victim of the crimes at issue.

## B.    January 30, 2015 Fake Drug Deal

Around the end of January 2015, Ryan Sniffin asked his cousin Dylan Sniffin if the latter could connect him with someone to buy an ounce of cocaine. Dylan Sniffin thought of Cottom. Cottom and Ryan Sniffin arranged to meet on January 30.

At 5:22 p.m. that day, Cottom texted Ryan Sniffin, "come around 6:30." Cottom also called him at 5:52 p.m., and at 5:59 p.m., Cottom texted him again and arranged to meet at an address in La Quinta Cove.

Around 6:19 p.m., Ryan Sniffin drove his car to the agreed-upon address, taking with him Dylan Sniffin and Ryan Sniffin's roommate Noel Reimers. Once there, Reimers knocked on the door of the home, which appeared to be vacant, but no one answered. She then returned to the car and sat in the front passenger seat. Dylan Sniffin sat in the back seat. At 6:19 p.m., Ryan Sniffin texted Cottom, "What's up, man?" At 6:22 p.m., he called Cottom.

Surveillance footage shows Cottom standing in the Ramirez brothers' driveway at 6:26 p.m. and Wilson riding up to him on

a mountain bike, wearing a sweatshirt.[6]  At 6:27 p.m., both rode their bikes down the driveway and in the direction of the crime scene.

At 6:31 p.m., Ryan Sniffin texted Cottom, "Hey, I got to get headed up the hill."  Soon thereafter, Dylan Sniffin saw three bike riders wearing hooded sweatshirts ride past the car in which Reimers and Dylan and Ryan Sniffin were sitting.

What happened over the course of the next few minutes—the specific circumstances under which Cottom shot Ryan Sniffin, and what Wilson was doing when this happened—was the subject of conflicting testimony at trial, which we outline in more detail in the following section.

By 6:38 p.m., Dylan Sniffin called 911 on a cell phone and told the 911 operator that Cottom had shot Ryan Sniffin.

A few minutes later, at 6:40 p.m., surveillance footage shows someone running up the Ramirez brothers' driveway. Moments later, surveillance footage shows a person riding down the driveway on a bicycle and to the north and the person who ran up the driveway walking south.  At 6:47 p.m., Mike Ramirez appears in his driveway.  At 6:53 p.m., a female walks up the driveway.  At 6:58 p.m., Mike Ramirez walks south.  At 7:21 p.m., a person walks, then runs, south.

At the scene of the homicide, in the trunk of Ryan Sniffin's car, the police found a jacket stained with what appeared to be blood.  A pocket contained a gray case holding six little baggies of white powder.  A test of the powder taken at the scene was

---

[6] Although there was testimony that the time was 7:25 p.m., it is later described as being 6:28 p.m.  Testimony established that the time on the surveillance video was 57 minutes later than the actual time.

negative for methamphetamine or cocaine. Police also found $555 in cash on the floorboards inside the car and a cigarette butt on the ground by the driver's door. The parties stipulated that forensic testing of the cigarette butt detected male DNA that was not Wilson's.

Ryan Sniffin died later that night from the gunshot wound.

### C. Evidence at Trial Regarding Circumstances of Ryan Sniffin's Death

The evidence presented at trial included testimony and other evidence establishing the general sequence of events, which we summarized above. It also included testimony presenting conflicting accounts of what happened between the time Dylan Sniffin saw three individuals in hoodies approaching the car and the time Cottom shot Ryan Sniffin.

#### 1. *Dylan Sniffin's Eyewitness Testimony Suggesting Wilson Was Not Near Cottom at the Time of the Shooting*

The only witness to the shooting who testified at trial was Dylan Sniffin, called by the prosecution. He testified that, after seeing the three individuals in hoodies drive past on bikes, "one stayed at the top of the street . . . [then] two of them rode down, and one rode back up, which was [Cottom]. And he rode up to . . . the car." The individual who rode back down did not come to the car with Cottom, but instead waited behind a car at a nearby intersection at the top of the street. Dylan Sniffin described this rider as being more heavy set than the others, and subsequently identified him as Mike Ramirez, whom Dylan Sniffin knew from juvenile hall. Dylan Sniffin was not sure whether the third rider waited at the top of the street or went elsewhere.

7

Dylan Sniffin testified that Cottom, alone, rode his bike to the driver's side of the car.  Ryan Sniffin opened his door but stayed seated inside.  He got out of the car and shook hands with Cottom.  Cottom "got to business" and handed Ryan Sniffin two baggies of white powder.  Ryan Sniffin opened one of the baggies, examined it, then gave it back.  He told Cottom, " 'Let me know if . . . you get some better stuff.' "  They said, "Later" and Ryan Sniffin said, "Bye."

Dylan Sniffin got back in the car and Ryan Sniffin closed his door as Cottom rode his bike to the intersection.  Cottom then got off his bike and walked back to the car with his hand in his sweatshirt pocket.  The car windows were open. Pulling a gun from his pocket, Cottom told Ryan Sniffin, "What's up.  Give me all your money," and pointed the gun at him.  Cottom's hand was shaking.  Ryan Sniffin pushed the gun away when Cottom touched it to the former's head and neck.  Cottom fired a shot into his neck.

Cottom fled as Ryan Sniffin screamed and lunged over Reimers and out the passenger side window.  Dylan Sniffin got out of the car and ran trying to get help while Reimers held Ryan Sniffin.

About 10 to 15 minutes after the shooting, Dylan Sniffin saw Wilson and another person drive by in a red car.  Wilson and the other individual hung out the windows staring and giving Dylan Sniffin a "dirty look."

## 2. *Testimony That Wilson Was Armed and Near Cottom at the Time of the Shooting*

### a. *Vivas's testimony[7]*

Vivas testified that around 10:00 a.m. the day Ryan Sniffin was shot, Cottom visited Vivas's home, where they used drugs.[8] Cottom told Vivas that he and Wilson were going to "do a lick" later that night, which Vivas defined as "[a] fast way to get money or something," possibly by committing a robbery. Their plan was to ride their bicycles to Ramirez and Durango streets and try to sell two bags halfway full of baking soda or another white substance as cocaine for $600 or $700. If they could not sell the fake cocaine, they would just take the money. Cottom told him the "lick" was Wilson's idea, and that Wilson and Wilson's brother helped plan it. During this same visit, Wilson showed Vivas a silver .38 revolver.

Two days after Ryan Sniffin's death, Wilson again visited Vivas. Wilson told Vivas that he and Cottom had ridden bikes to Ramirez Street and tried to sell "these boys in their car" fake cocaine. Vivas testified that Wilson explained the "guy" had tested it and gave it back saying, " 'What the hell is this?' "

---

[7] Vivas testified about things he claimed Cottom and Wilson had told him about the evening Ryan Sniffin died. Vivas testified that, after he found out that he was facing over 16 years in prison for an armed robbery (unrelated to this case), he agreed to testify about statements Cottom and Wilson had made to him over a year earlier, in exchange for which Vivas would serve no actual jail or prison time for the armed robbery charges he was facing.

[8] Cottom's brother and mother testified that Cottom was at school that day.

"[T]he guy" then reached for something and both Wilson and Cottom told him to stop. Cottom got nervous and shot the guy in "the head." When asked at trial whether Wilson said anything to Vivas "about whether [Wilson] was there during the time of the lick," Vivas responded, "Yes. . . . [H]e said he was . . . there pointing—pointing his gun [at Ryan Sniffin]. A little—I can't—I don't know what kind of gun it was. I—a TEC-9—but he said—he said he was pointing the gun, too, right there on the side of [Cottom] and watching everything that was happening." Vivas later more unequivocally testified that Wilson told him that Wilson "was right there at the scene with . . . Cottom . . . [¶] . . . [¶] . . .[and] [t]hat [Wilson] had his gun pointed, too, at the people."

### b. *Olds's statements*

The prosecution presented testimony regarding statements Wilson made to his neighbor and friend Olds.

#### i. *The investigator's testimony relaying Olds's statements*

The investigator testified at trial that Olds told him the following: Approximately two weeks after Ryan Sniffin's death, Wilson told him that he (Wilson) had been involved in a homicide and had smoked in the area of the crime scene, possibly leaving a cigarette butt. Wilson stated he was worried that he would be going away for a long time because the cigarette butt might contain his DNA. Wilson also told Olds that Wilson felt he had given Cottom the wrong gun, a .38, and wished he had given Cottom a "TEC-9 or MAC-10 or Glock 19," because if he had, "this" would not have happened. Wilson said that he was armed with a MAC-10 when Cottom shot Ryan Sniffin. Olds had been

10

to Wilson's house and had seen a TEC-9, MAC-10, Glock 19, and shotguns. Olds and Wilson were both using methamphetamine at Olds's house when Wilson made these statements to Olds.

> ### ii. *Lea Martin's testimony conveying Olds's statements*

Olds's live-in girlfriend Lea Martin (Martin) testified as follows regarding Olds's statements to her: Early one morning in February 2015, she had found Olds "quite zoned [out]" and "completely terrified" in their garage. Olds stated to Martin that Wilson had told him about "some sort of drug deal gone wrong" and that Wilson "was sitting next to the kid when it had happened" and "after the initial death of the kid, they had parted ways," which she understood to mean they walked off in different directions. Wilson told Olds he was worried that he would be caught because he may have left a cigarette butt behind at the crime scene.

### c. *Raul Barazza's testimony*

Raul Barazza testified that while he was in juvenile hall with Cottom, Cottom told Barazza that Cottom was in for murder because he was "gonna do a lick." "He was trying to rob somebody, but then it went wrong[,] so he shot him." Barazza testified that Cottom said, "They [the victims] wanted to buy some [cocaine], but I guess the guy didn't want to give them nothing; so he shot him." Barazza further testified that Cottom said he had done the "lick" with a "friend[ ]," and that the friend was "[b]ehind him" during the "transaction."

Barazza admitted he had agreed to testify because the prosecutor promised him a substantially reduced sentence in

connection with three counts of robbery unrelated to Cottom's case. He also was an informant in multiple other cases.

### d. *Cottom's statements to his mother*

The prosecutor played recorded jail calls between Cottom and his mother on February 9, 2015. In one, Cottom states, "You know I wish I never did this." In another call recorded later that day, Cottom's mother asks him, "You're saying there was Kenny near you?" and Cottom answers, "Yeah." She then asks, "And then how did you separate from Kenny?", to which Cottom responds, "Mom, I can't talk about it."

### 3. *Evidence Regarding Unrelated Subsequent Robbery*

Over Wilson's objection, the court admitted evidence of Wilson's involvement in the robbery of Donald "Ian" Moore (the Moore robbery) on the basis that it was relevant under Evidence Code section 1101 to prove Wilson's intent to permanently deprive Ryan Sniffin of his property.

Moore testified that he invited Wilson to his house to smoke methamphetamine with him. At that time, Moore had been using methamphetamine daily for two years. At Wilson's request, Moore opened the garage door to let Wilson's brother in.

Ian then heard banging from inside his house. He went into his father's room to investigate and saw Wilson's brother in the closet. Wilson entered the room and told Moore not to fight, they just wanted the money and the guns. Wilson forced Moore to sit on the bed and said, " 'Why shouldn't I just kill you right now. You are going to snitch.' " Wilson's brother told Moore to put his face in a pillow and not to look. Wilson's brother and Wilson broke a wall to remove a safe from the closet, then took

the safe, guns, a suitcase full of various items, and Moore's cell phone and left.

Additional details about the Moore robbery came through Vivas's testimony and the investigator's testimony. Vivas testified that Wilson told him that he had robbed Moore. The investigator testified that Olds told him he lived across the street from Moore's house and had seen Wilson in Moore's garage with a hatchet in his hand. Moments later, Olds saw Wilson and Wilson's brother run up the street with a safe in a trash can.

### D.    Jury Verdict

The jury found both defendants guilty as charged. For the murder count, the court sentenced Cottom to 25 years to life and Wilson to life without the possibility of parole (LWOP). Pursuant to section 654, the court stayed both defendants' respective sentences for the attempted robbery counts and the firearm enhancements.

The court ordered Wilson to pay $1,794 in restitution, and ordered Cottom to pay restitution in an amount to be determined. The court awarded Cottom credit for 2,093 actual days spent in presentence custody, but did not award Wilson any presentence custody credit.

Wilson and Cottom each timely appealed. As noted, Cottom's appeal was resolved in a March 1, 2023 unpublished opinion of this court, which became final as to Cottom on December 7, 2023.

13

## DISCUSSION

### A. Substantial Evidence Supports That Wilson Acted with Reckless Indifference to Human Life

Felony murder is a murder that "is committed in the perpetration of, or attempt to perpetrate" one of enumerated felonies, including robbery. (§ 189, subd. (a).) "A participant in the perpetration or attempted perpetration of [such] a felony . . . in which a death occurs is liable for murder only if" the prosecution also proves one of the following: "[t]he person was the actual killer," "[t]he person was not the actual killer, but, with the intent to kill, aided, abetted, counseled, commanded, induced, solicited, requested, or assisted the actual killer in the commission of murder in the first degree," or "[t]he person was a major participant in the underlying felony and acted with reckless indifference to human life, as described in subdivision (d) of Section 190.2." (§ 189, subd. (e).) At trial, the prosecutor proceeded on a theory that Wilson was guilty of felony murder because he was a major participant in an attempted felony (robbery) who acted with reckless indifference to human life. On appeal, Wilson challenges only the finding that he acted with reckless indifference to human life—not that he was a major participant in the underlying attempted robbery.

Reckless indifference encompasses a willingness to assist another in killing to achieve a particular goal, even if the victim's death was not specifically intended. (See *People v. Clark* (2016) 63 Cal.4th 522, 617 (*Clark*) [reckless indifference to human life "encompasses a willingness to kill (or to assist another in killing) to achieve a distinct aim, even if the defendant does not specifically desire that death as the outcome of his actions"].)

14

"This definition encompasses both subjective and objective elements.  The subjective element is the defendant's conscious disregard of risks known to him or her.  But recklessness is not determined merely by reference to a defendant's subjective feeling that he or she is engaging in risky activities.  Rather, recklessness is also determined by an objective standard, namely what 'a law-abiding person would observe in the actor's situation.' " (*Ibid.*)

In *Clark, supra,* 63 Cal.4th 522, the California Supreme Court identified circumstances that may be considered in determining whether a non-shooter aider and abettor to a felony acted with reckless indifference for human life.  These are:  (1) the "defendant's awareness that a gun will be used in the felony," the number of guns used, and/or the "defendant's use of a firearm, even if the defendant does not kill the victim" (*id.* at p. 618, italics omitted), (2) the defendant's "physical presence at the crime and opportunities to restrain the crime and/or aid the victim" (*id.* at p. 619, capitalization & italics omitted), (3) the "[d]uration of the felony" (*id.* at p. 620, capitalization & italics omitted), (4) the "defendant's knowledge of [the] cohort's likelihood of killing" (*id.* at p. 621, capitalization & italics omitted), and (5) the "defendant's efforts to minimize the risks of the violence during the felony." (*Ibid.*, capitalization & italics omitted); see *id.* at pp. 618−621 [adopting these factors as initially set forth in *People v. Banks* (2015) 61 Cal.4th 788 (*Banks*)].)  " '[Not] one of these considerations is necessary, nor is any one of them necessarily sufficient.' [Citation.]" (*Clark, supra,* at p. 618.)

We review challenges to the sufficiency of the evidence for substantial evidence, meaning we determine, based on the "entire

15

record[,] whether a reasonable trier of fact could have found that the prosecution sustained its burden of proof beyond a reasonable doubt[,] . . . consider[ing] the evidence in a light most favorable to the judgment." (*People v. Mincey* (1992) 2 Cal.4th 408, 432.)

Wilson argues that Vivas's testimony and Olds's statements—the only evidence supporting that Wilson was present at the scene of the killing and in a position to facilitate or prevent the actual murder (the proximity factor) and the only evidence that Wilson himself was armed—is not "reasonable, credible, and of solid value" and thus cannot constitute part of the substantial evidence supporting a finding of reckless indifference. (*People v. Kipp* (2001) 26 Cal.4th 1100, 1128.) To support this argument, he points to contrary testimony of the only percipient witness (Dylan Sniffin); Vivas's and Olds's lack of credibility as felons, drug users with impaired memories, and/or jailhouse informants; inaccuracies in their statements; inconsistencies in their statements over time; and an inherent implausibility of their version of events.

Wilson's argument ignores the scope of our role in reviewing for substantial evidence. "If there is conflicting testimony, we must accept the [trier of fact's] resolution of disputed facts and inferences, . . . and the version of events most favorable to the [judgment], to the extent the record supports them." (*People v. Zamudio* (2008) 43 Cal.4th 327, 342; *Peradotto v. State Personnel Board* (1972) 25 Cal.App.3d 30, 33 [substantial evidence review " 'begins and ends with a determination as to whether there is any substantial evidence, contradicted or uncontradicted, which supports the conclusion reached, disregarding any evidence in the record contrary to the trier's finding' "].)  Thus, inconsistencies between Dylan

16

Sniffin's testimony and Vivas's testimony or Olds's statements are not a basis on which we may reject the latter. Nor is anything "so inherently implausible about [Vivas's testimony and Olds's statements] to justify disregarding [them] under the substantial evidence rule." (*Fortman v. Hemco, Inc.* (1989) 211 Cal.App.3d 241, 254; see also *People v. Shelmire* (2005) 130 Cal.App.4th 1044, 1059 [the court had "no doubt that a defendant's story (his version of the events in question) constitutes substantial evidence, in and of itself, even if the story is implausible and seriously contradicted by other evidence"].) Likewise, we may not reject this evidence because Vivas and Olds each had a strong motive to lie. (See *Evje v. City Title Ins. Co.* (1953) 120 Cal.App.2d 488, 492 [" 'testimony which is subject to justifiable suspicion do[es] not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends' "]; see also Evid. Code, § 780.) We thus consider Vivas's and Olds's statements as a source of evidence in assessing the sufficiency of the evidence under the *Clark* factors.

As to the first *Clark* factor, "[a] defendant's use of a firearm, even if the defendant does not kill the victim . . . , can be significant to the analysis of reckless indifference to human life." (*Clark, supra*, 63 Cal.4th at p. 618.) Here, Vivas's testimony supports that Wilson supplied the murder weapon to Cottom, and the jury could reasonably infer that Wilson gave it to him loaded. Vivas, Martin, and the investigator's testimony also supports both that Wilson was armed during the robbery and a reasonable inference that Wilson's weapon was loaded. Introducing loaded weapons into a robbery substantially

17

increases the risk that the robbery will end in lethal violence—simply put, "[e]veryone knows the main purpose of a loaded gun is to hurt people." (*People v. Douglas* (2020) 56 Cal.App.5th 1, 10; see *ibid.* [Use of a loaded gun and lack of efforts to mitigate attendant risk of harm supported reckless indifferences, because "[the defendant's] plan was a gun plan. . . . He gave [a loaded gun] to [the shooter] but made no effort to unload it or to caution [the shooter] about restraining his conduct" or to otherwise plan the crime in a manner to minimize the risk of harm].)

Another consideration is the proximity of the defendant to the killing. (*Clark, supra*, 63 Cal.4th at p. 619.) A defendant's presence close to the shooting " 'gives him an opportunity to act as a restraining influence on murderous cohorts. If the defendant fails to act as a restraining influence, then the defendant is arguably more at fault for the resulting murders.' " (*Ibid.*) Here, the jury could reasonably infer from the testimony that Wilson was standing next to Cottom at the time of the shooting. The record does not suggest that Wilson made any effort to restrain Cottom from returning to the car after Ryan Sniffin refused the fake drugs, or to restrain Cottom from shooting Ryan Sniffin once Cottom had returned to the car. Moreover, Wilson's proximity to Cottom—particularly when combined with Wilson being armed—also increases the likelihood that Cottom might use potentially lethal force to achieve the ends of the robbery. There is strength in numbers; all else being equal, a man who knows he has an armed compatriot beside him is more likely to feel emboldened to use his weapon. A reasonable person in Wilson's position would understand that his armed presence next to Cottom at the scene could embolden Cottom to use his own gun, and thus increase the likelihood of lethal violence beyond that inherent in any

18

armed robbery.  As a corollary to proximity, courts also consider a defendant's efforts to assist the victim.  Nothing in the record suggests Wilson attempted to assist Ryan Sniffin after Cottom shot him.

We also consider whether a defendant attempts to minimize the risks of violence during the robbery.  (*Clark, supra*, 63 Cal.4th at pp. 621–622.)  Here, the evidence supports that Wilson helped plan the robbery at a location in front of a vacant home after dark and using two guns—a plan that increased, rather than reduced, the likelihood of lethal violence.  By contrast, in *Clark*, the defendant planned the robbery to occur at a time when most of the employees would be gone, the gun used in the robbery was supposed to be unloaded, and the gun recovered after the shooting had only been loaded with one bullet.  (*Ibid*.)  The record does not support that any similar circumstances were present here.

Considering the record as a whole, we conclude that the jury could reasonably infer that Wilson acted with reckless indifference to human life.

None of the cases Wilson cites in which evidence of reckless indifference was found insufficient involves a defendant who was himself armed and in close proximity to the killing when it occurred.  (See *People v. Bascomb* (2020) 55 Cal.App.5th 1077, 1090 ["[t]he defendants who have shown their culpability was too slight under *Banks* and *Clark* 'are those who were not wielding guns themselves and also not present for the shooting' "].)  In *In re Scoggins* (2020) 9 Cal.5th 667, for example, the defendant "did not use a gun, nor did he know that a gun would be used during the felony" (*id.* at p. 677) and he "did not arrive at the crime scene until after the shooting occurred."  (*Id.* at p. 678.)

19

In *In re Taylor* (2019) 34 Cal.App.5th 543, the defendant was waiting in the car during the planned robbery (*id.* at p. 559) and "did not supply [the shooter] with the murder weapon[,]. . . [n]or did [the defendant] have or use his own weapon during the crime. Thus, . . . there [was] little about [the defendant's] use or knowledge of firearms that suggest[ed] he appreciated the planned robbery posed a heightened risk of death." (*Id.* at pp. 557–558.) The other cases on which Wilson relies are similarly distinguishable. (See *Banks, supra*, 61 Cal.4th at p. 805 [defendant was not armed, had no role in procuring arms for others, and "[d]uring the robbery and murder, . . . was absent from the scene, sitting in a car and waiting"]; *Clark, supra*, 63 Cal.4th at p. 619 [defendant not armed and was waiting across the parking lot from the store where his cohort shot the victim]; *In re Ramirez* (2019) 32 Cal.App.5th 384, 404 [defendant was not himself armed and "was not at the immediate location of the killing"].)

Finally, Wilson argues that his youth should be considered in determining whether he acted with reckless disregard for human life. He cites sentencing cases and statutes that contain or imply "the observation that recklessness is one of the distinctive attributes of youth." But even a 20-year-old can understand that two armed individuals attempting to trick someone into buying fake drugs on a dark, empty street involves a high risk of someone getting shot and killed. And the defense did not present evidence suggesting that anything about Wilson

20

at age 20 or his childhood rendered him generally less capable of appreciating the risk of death in such a situation.[9]

## B.    Admission of Evidence Regarding the Moore Robbery

Wilson challenges the admission of evidence regarding the Moore robbery, arguing that the court abused its discretion in admitting the evidence.  Specifically, he argues that the evidence was not admissible under Evidence Code section 1101, subdivision (b), which establishes an exception to the general rule that character evidence is inadmissible to prove a defendant's conduct on a specific occasion, and that even if it was admissible under that section, the court should have excluded it under Evidence Code section 352.  We need not decide whether he is correct, because even if the court erred in admitting the evidence, any such error was not prejudicial.

---

[9] To this extent, the recent decision of the First District Court of Appeal considering the age of a young adult in assessing reckless disregard for human life is distinguishable. (See *People v. Jones* (2022) 86 Cal.App.5th 1076, 1091 ["the record of conviction included a report provided by the defense for the sentencing hearing pursuant to . . . *People v. Franklin* (2016) 63 Cal.4th 261 . . . and section 3015 . . . assert[ing] that he had a traumatic and violent upbringing, had suffered from under-diagnosed mental health issues and drug abuse, witnessed his first murder at age 10, had become numb to violence, was vulnerable to increased aggression, and appeared to be impulsive rather than criminally sophisticated"].)  To the extent that case stands for the proposition that being 20 years old is a factor that inherently weighs against a finding of reckless indifference, we disagree.

Wilson first urges that the admission of this evidence was so prejudicial, it denied him a fair trial, requiring reversal unless the state "prove[s] beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." (*Chapman v. California* (1967) 386 U.S. 18, 24.)  To establish prejudice on this ground, the error must " 'render[ ] the trial so arbitrary and fundamentally unfair that it violated federal due process.' " (*Jammal v. Van de Kamp* (9th Cir. 1991) 926 F.2d 918, 920.)  "[F]ailure to comply with the state's rules of evidence is [not] . . . a sufficient basis for" establishing such fundamental unfairness.  (*Id.* at p. 919.)  Wilson simply has not established that the effects of the Moore robbery evidence permeated and tainted the entire trial to such an extent that the trial was arbitrary and fundamentally unfair.  Therefore, *Chapman* does not provide the appropriate standard for our harmless error analysis.

Rather, in assessing prejudice from any error in admitting the Moore robbery evidence, we apply *People v. Watson* (1956) 46 Cal.2d 818, and consider whether it is reasonably probable that, had the jury not heard the Moore robbery evidence, the jury would have entered a verdict more favorable to Wilson.  (See *id.* at p. 836.)

Wilson takes the position that such a reasonable likelihood exists, first arguing that "[t]his highly inflammatory evidence would have obviated any concerns the juror[s] would have had about [Vivas's] compromised credibility as well as the credibility of other witnesses," namely Barazza and Olds.  Wilson impeached the credibility of these individuals at trial based on their being felons, drug addicts, and/or themselves criminal defendants with a self-serving motive to provide helpful testimony to

22

the prosecution. But the fact that Wilson committed felonies and used drugs cannot rehabilitate a witness following such impeachment; indeed, such evidence has no logical bearing on the credibility of the prosecution's witnesses at all. And Wilson did not offer testimony contradicting Vivas's, Olds's, or Barazza's respective versions of events, so Wilson's credibility relative to that of others is not at issue.

Wilson also contends that admission of this evidence was prejudicial in that it "allowed the jurors to prejudge [Wilson] and conclude that, because of his criminal propensity and bad character, he had to have committed the felony[ ]murder, even though [Vivas's] and [Olds's] credibility was doubtful and their statements were inconsistent, unreliable, and too convenient for the prosecution." But the jury was instructed "not [to] consider [the Moore robbery evidence] for any other purpose except for the limited purpose of intent to deprive the owner of the property permanently" and "not [to] conclude from this evidence that the defendant has a bad character or is disposed to commit a crime." "When, as here, there are no indications to the contrary, we assume that the jurors followed the trial court's instructions" and did not, based solely on their viewing Wilson as a generally bad person who commits crimes, find him guilty of murder without supporting evidence. (*People v. Leonard* (2007) 40 Cal.4th 1370, 1413.)

In arguing to the contrary, Wilson describes the prosecution's murder case against Wilson as weak, a description based primarily on his characterization of Vivas, Olds, and Barazza as unreliable witnesses. Wilson's efforts to find inconsistencies in these witnesses' statements notwithstanding, many aspects of their statements were either uncontradicted or

23

corroborated by other evidence, such that any credibility concerns have a more limited effect on the strength of the prosecution's case. Still, Vivas's, Olds's, and Barazza's respective statements *do* conflict with other evidence on two key points: Wilson's proximity to Cottom at the time of the shooting and Wilson's use of a firearm, both of which are crucial to the reckless indifference analysis. But this conflicting evidence does not assist Wilson in establishing prejudice from the admission of the Moore robbery evidence. First, even assuming the jury ignored the limiting instruction and inferred Wilson had a general propensity to commit crimes, a general criminal propensity does not make it more likely that one will participate in a crime *in a specific way*— namely, by using a gun, or by brandishing a gun himself during a shooting, which by all accounts, was unplanned. Second, the Moore robbery evidence does not support more specific propensity inferences, such as a propensity to use firearms. The Moore robbery did not involve firearms. It is thus not reasonably likely that the Moore robbery evidence caused the jury to make improper propensity inferences that allowed them to more easily believe the key testimony from the witnesses Wilson identifies. Thus, even assuming the court incorrectly admitted the Moore robbery evidence under Evidence Code section 1101 and/or Evidence Code section 352, Wilson has not established *Watson* prejudice from any such error.

## C. Constitutional Arguments

Wilson raises several constitutional challenges to the statutes under which he was sentenced (§§ 190.2, 190.5), the statute deeming him ineligible for a youth offender parole

24

hearing (§ 3051), and the imposition of a LWOP sentence in his case.[10]

### 1.    *Equal Protection Arguments*

As a preliminary matter, Wilson's equal protection arguments distinguish between those who committed crimes while under 18 years, and those who committed crimes between the ages of 18 and 25 years, a period during which, according to relatively recent neurological research Wilson cites, the brain is still developing, in particular the portions responsible for " 'executive functions' " like foreseeing and weighing potential consequences and moderating " 'correct' " and risk-taking behavior.  For ease of reference, we shall refer to those under 18 years as "juveniles" and to those between the ages of 18 and 26 years as "young adults."

Wilson first challenges the constitutionality of the sections under which he was sentenced to LWOP (§§ 190.2, 190.5), arguing that their "retention of mandatory LWOPs for [young adult] offenders [who commit special circumstances murder] . . . deprives such offenders of equal protection."  He also challenges section 3051, the statute addressing eligibility for a youth offender parole hearing as violating constitutional equal protection guarantees.

The California Supreme Court's recent decision in *Hardin*, *supra*, 15 Cal.5th 834 changed the analytical framework we apply in considering certain types of equal protection challenges.  Before *Hardin*, this was a two-step analysis, in which " '[t]he

---

[10] The People argue that Wilson has forfeited his constitutional arguments by failing to raise them below. We exercise our discretion to consider these arguments.

25

first prerequisite . . . is a showing that the state has adopted a classification that affects two or more similarly situated groups in an unequal manner.' [Citations.] This initial inquiry is not whether persons are similarly situated for all purposes, but 'whether they are similarly situated for purposes of the law challenged.' [Citation.]" (*Cooley v. Superior Court* (2002) 29 Cal.4th 228, 253, italics omitted.) The second step of the analysis considered whether, when a class of criminal defendants is similarly situated to another class of defendants that is sentenced differently, there is a rational basis for the difference. (See *Johnson v. Department of Justice* (2015) 60 Cal.4th 871, 882.) "[E]qual protection of the law is denied only where there is no 'rational relationship between the disparity of treatment and some legitimate governmental purpose.' " (*People v. Turnage* (2012) 55 Cal.4th 62, 74.) *Hardin* clarified, however, that "when plaintiffs challenge laws drawing distinctions between identifiable groups or classes of persons, on the basis that the distinctions drawn are inconsistent with equal protection, courts no longer need to ask at the threshold whether the two groups are similarly situated for purposes of the law in question. The only pertinent inquiry is whether the challenged difference in treatment is adequately justified under the applicable standard of review"—namely, rational basis review. (*Hardin*, *supra*, at pp. 850–851.) "Under this deferential standard, we presume that a given statutory classification is valid 'until the challenger shows that no rational basis for the unequal treatment is reasonably conceivable.' " (*Id*. at p. 852.)

### a.     *Sentencing statutes*

Taken together, sections 190.2 and 190.5 create a mandatory LWOP sentence for those who commit first degree

26

special circumstances murder as a young adult, but not for those who commit the offense as juveniles. (See §§ 190.2, subd. (a), 190.5, subd. (b).) Wilson argues that there is no constitutionally justifiable basis for the law to distinguish these two similarly situated groups because, based on the scientific research Wilson cites, both groups " 'have a diminished culpability and greater prospects for reform.' "

The Supreme Court has "held on multiple occasions that a sentencing rule permissible for adults may not be so for children." (*Miller v. Alabama* (2012) 567 U.S. 460, 481.) Courts of Appeal have rejected equal protection challenges to the disparate treatment of young adult LWOP offenders and juvenile LWOP offenders under other laws, concluding that, even if these two groups are similarly situated, such disparate treatment is constitutionally justifiable. (See *People v. Sands* (2021) 70 Cal.App.5th 193, 204, review den. Dec. 22, 2021, S271797 [addressing equal protection challenge to section 3051]; *In re Jones* (2019) 42 Cal.App.5th 477, 481 [addressing equal protection challenge to section 1170, subdivision (d), which entitles certain offenders convicted of crimes they committed as juveniles to submit a petition for resentencing].) Neither the holding nor the reasoning of *Hardin* is inconsistent with these decisions. We find this same reasoning persuasive here. In drafting section 190.5, the Legislature had a rational basis for distinguishing between offenders who commit the same crime "based on their age" (*Sands*, *supra*, at p. 204), any neurological similarities between the two types of offenders notwithstanding.

### b. *Youth offender parole hearing statute*

We next consider Wilson's equal protection challenges to the youth offender parole hearing statute, section 3051.

Section 3051 requires that an offender convicted of a crime he or she committed before the age of 26 receive a "youth offender parole hearing" after a certain period of incarceration.[11]  (§ 3051, subd. (b).)  The requirement for such a hearing does not apply, however, to, inter alia, "cases in which an individual is sentenced to [LWOP] for a controlling offense that was committed after the person had attained 18 years of age," as here.  (§ 3051, subd. (h).)

At such a hearing, the reviewing board is to "give great weight to . . . the hallmark features of youth, and any subsequent growth and increased maturity of the prisoner."  (§ 4801, subd. (c); see *Franklin, supra*, 63 Cal.4th at p. 283.)  Such hearings are intended " 'to give youthful offenders "a meaningful opportunity to obtain release" after [a certain amount of time] in prison (§ 3051, subd. (e)) and . . . " 'a showing of rehabilitation and maturity' " ' and 'to account for neuroscience research that the human brain—especially those portions responsible for judgment and decisionmaking—continues to develop into a person's mid-20s.' [Citation]." (*People v. Wilkes* (2020) 46 Cal.App.5th 1159, 1166.)

Wilson challenges the constitutionality of section 3051 in two ways.  First, he argues it guarantees *juveniles* who commit LWOP offenses an opportunity to obtain release on parole, but

---

[11] An earlier version of section 3051 only required youth offender parole hearings for juveniles.  In 2018, the Legislature amended it to provide this benefit to young adults under certain circumstances, as outlined above.

denies such an opportunity to *young adults* who commit LWOP offenses.  This argument fails for the same reasons Wilson's challenge to the sentencing statutes fails:  the Legislature is constitutionally justified in treating juveniles and young adults differently.  (See Discussion *ante*, part C.1.a.)

Wilson's second argument is that section 3051 violates equal protection because it denies a youth offender parole hearing for defendants convicted of LWOP offenses they committed as young adults, but grants such a hearing to an offender *of the same age* who receives a de facto LWOP sentence—that is, one comprised of sentences for multiple non-LWOP crimes that result in a required period of incarceration that is longer than the offender's natural life.

This argument has been rejected by our state Supreme Court.  "[T]here is a rational basis justifying section 3051's disparate treatment of individuals who . . . are serving sentences of life without parole for special circumstance murder."  (*Hardin, supra*, 15 Cal.5th at p. 851.)  In his supplemental briefing following remand, Wilson does not argue to the contrary.  Accordingly, Wilson has not established that section 3051 violates equal protection, and the court did not err by applying the statute.

### 2. *Cruel and Unusual Punishment Arguments*

Wilson argues his LWOP sentence constitutes cruel and unusual punishment in various ways under both the federal and California constitutions.  For the reasons we discuss below, we disagree.

29

### a. *Neuroscientific research does not justify expanding existing law to LWOP sentences for young adult offenders*

The United States Supreme Court and California Supreme Court have held that imposing the death penalty or an LWOP sentence on defendants for crimes they committed as juveniles constitutes cruel and unusual punishment. (See *Roper v. Simmons* (2005) 543 U.S. 551, 568–575 (*Roper*); *Miller, supra*, 567 U.S. at p. 476-477*; People v. Caballero* (2012) 55 Cal.4th 262, 268.) The Court's reasoning in this line of cases focuses in part on scientific research regarding the "fundamental differences between juvenile and adult minds" (*Graham v. Florida* (2010) 560 U.S. 48, 68 (*Graham*)) and how the juvenile brain is still developing, as a result of which juveniles are "more capable of change than are adults." (*Ibid.*, citing *Roper, supra*, 543 U.S. at p. 570.)

As Wilson acknowledges, these cases address cruel and unusual punishment for those who committed offenses as juveniles, not young adults. (See *People v. Morales* (2021) 67 Cal.App.5th 326, 347 ["the United States and California Supreme Courts have not held that LWOP sentences for youthful offenders violate the Eighth Amendment"].) Wilson argues that, based on recent neuroscientific research that renders use of an age-18 dividing line outdated, we should hold that an LWOP sentence for a crime committed while the offender was a young adult is categorically cruel and unusual punishment as well.

But the United States Supreme Court long ago recognized that "qualities . . . distinguish[ing] juveniles from adults do not disappear when an individual turns 18"—and that "a line must be drawn" nevertheless. (*Roper, supra*, 543 U.S. at p. 574.)

30

Our state Supreme Court has similarly refused to extend the principles under *Miller*, *Graham*, and *Roper* to young adults 18 years of age or older.  (See *People v. Flores* (2020) 9 Cal.5th 371, 429–430 (*Flores*); *People v. Powell* (2018) 6 Cal.5th 136, 191; *People v. Gamache* (2010) 48 Cal.4th 347, 405.)  Consistent with this, Courts of Appeal have uniformly rejected arguments similar to Wilson's.  (See, e.g., *People v. Argeta* (2012) 210 Cal.App.4th 1478; *People v. Abundio* (2013) 221 Cal.App.4th 1211.)  California courts have reached the same conclusion under the California constitutional prohibition of cruel and unusual punishment.  (See *People v. Tran* (2022) 13 Cal.5th 1169, 1234 (*Tran*); *In re Williams* (2020) 57 Cal.App.5th 427, 437–439; *id.* at p. 439 ["[t]o the extent petitioner contends an LWOP sentence is an unconstitutional cruel and unusual punishment when imposed on any 21-year-old defendant, . . . our Supreme Court has essentially rejected that very argument in the context of the death penalty," italics omitted].)

As have other courts presented with similar arguments, we "decline [the] invitation to conclude new insights and societal understandings about the juvenile brain require us to conclude the bright line of 18 years old in the criminal sentencing context is unconstitutional.  Our nation's, and our state's, highest court have concluded 18 years old is the bright-line rule and we are bound by their holdings."  (*People v. Perez* (2016) 3 Cal.App.5th 612, 617; accord, *People v. Montelongo* (2020) 55 Cal.App.5th 1016, 1032 (*Montelongo*).)[12]

---

[12] We are also not persuaded by Wilson's arguments that section 3051 "extend[ing] mitigated culpability up to the age of 25" supports Wilson's cruel and unusual punishment argument

### b. *Wilson's LWOP sentence is not so grossly disproportionate to his crime that it constitutes cruel and unusual punishment*

Wilson next argues that his LWOP sentence violates California's constitutional ban on cruel and unusual punishment because it is grossly disproportionate to his individual moral culpability. When faced with such a claim, "[a] reviewing court determines whether a particular penalty given ' "is so disproportionate to the crime for which it is inflicted that it shocks the conscience and offends fundamental notions of human dignity." ' " (*People v. Cole* (2004) 33 Cal.4th 1158, 1235.) "We . . . use a three-pronged approach to determine whether a particular sentence is grossly disproportionate. First, we review 'the nature of the offense and/or the offender, with particular regard to the degree of danger both present to society.' " (*People v. Johnson* (2010) 183 Cal.App.4th 253, 296.) This analysis requires consideration of " 'the circumstances of the offense, including the defendant's motive, the extent of the defendant's involvement in the crime, the manner in which the crime was committed, and the consequences of the defendant's acts[,]' " as well as " 'the defendant's age, prior criminality[,] and mental capabilities.' [Citation.]" (*Cole, supra*, at p. 1235.) "Second, we compare the challenged punishment with punishments prescribed for more serious crimes in our jurisdiction. [Citation.]

---

in the manner he suggests. Section 3051 itself maintains the 18-year-old dividing line in the context of LWOP offenses (see § 3051, subd. (h)), and our state Supreme Court has rejected similar arguments based on section 3051 that challenge the death penalty for young adults. (*Tran, supra*, 13 Cal.5th at p. 1235, quoting *Flores, supra,* 9 Cal.5th at p. 429.)

Third, and finally, we compare the challenged punishment to punishments for the same offense in other jurisdictions. [Citation.] The importance of each of these prongs depends upon the facts of each specific case[,] [citation] . . . we may base our decision on the first prong alone." (*Johnson*, *supra*, 183 Cal.App.4th at p. 297.) " 'Our Supreme Court has emphasized "the considerable burden a defendant must overcome in challenging a penalty as cruel or unusual." ' " (*People v. Sullivan* (2007) 151 Cal.App.4th 524, 569.) " 'Whether a punishment is cruel or unusual is a question of law for the appellate court, but the underlying disputed facts must be viewed in the light most favorable to the judgment.' " (*Ibid.*)

Wilson argues his LWOP sentence is grossly disproportionate based solely on the first prong of this analysis: namely, "the nature of the offense and/or the offender[, examined] with particular regard to the degree of danger both present to society." (*People v. Avila* (2020) 57 Cal.App.5th 1134, 1145.) He notes he was not the killer and that the evidence did not establish he intended to kill, citing authority for the proposition that "the [Supreme] Court has found criminal penalties to be unconstitutionally excessive in the absence of intentional wrongdoing." (*Enmund v. Florida* (1982) 458 U.S. 782, 800.) But acting with an intent to kill is not necessary for an LWOP sentence to survive a cruel and unusual punishment challenge. (See *People v. Young* (1992) 11 Cal.App.4th 1299, 1309 [LWOP is not a cruel and unusual punishment for a 19-year-old young adult with no significant criminal record who was convicted of first degree felony murder for unintentionally killing a bystander during a high speed chase while fleeing from the scene of a robbery].) As we conclude above, substantial evidence supports

that, considering the totality of the evidence—including substantial evidence that Wilson supplied the murder weapon, was armed during the robbery, and that the robbery was his idea—he acted with reckless indifference to human life.

Wilson argues his lack of an intent to kill and his nonkiller role in the crime, when considered together with the fact that he was 20 years old at the time of the murder, the neurological significance of this fact, and his personal and criminal background, render his LWOP sentence grossly disproportional to his culpability. Specifically, he argues that his criminal record reflects largely nonviolent offenses; it includes sustained juvenile petitions for misdemeanor vandalism, possession of brass knuckles, and disturbing the peace, and adult convictions for various misdemeanors, burglaries, and robberies with his older brother and others. He notes that both of his parents died a short time before the murder, and the two robberies he committed thereafter. He argues that one of the hallmarks of youth identified as a basis for the law treating juveniles differently is that "they 'are more vulnerable or susceptible to negative influences and outside pressures, including peer pressure' " (*Graham, supra*, 560 U.S. at p. 68)—here, the criminal influences of his brother, to which Wilson argues he was particularly susceptible after his parents died. He also points to evidence suggesting that his criminal activity correlates with his drug addiction, and that at some point after Ryan Sniffin's murder, he approached his aunt and uncle asking for help with his addiction. On these bases, he argues he is not the " 'rare juvenile offender whose crime reflects irreparable corruption' " (see *Miller, supra*, 567 U.S. at pp. 479–480), but rather a man in a difficult but temporary phase of his young

34

adulthood, fueled in part by lack of full neurological development. But neither "irreparable corruption," nor anything like it, is a requirement for imposing an LWOP sentence on a young adult offender. (*People v. Padilla* (2016) 4 Cal.App.5th 656, 672; see *ibid.* ["[u]nder *Montgomery*, *Miller* must be regarded as announcing a substantive rule barring LWOP terms for a specific class of *juvenile* offenders, namely, those ' "whose crimes reflect the transient immaturity of youth," ' not irreparable corruption," italics added].) We acknowledge that Wilson's personal background could provide reason to believe he may be able to change the trajectory of his life. But this does not mean that an LWOP sentence denying him that chance is grossly disproportionate as a punishment for his being a major participant in a robbery resulting in the death of another, in connection with which Wilson acted with reckless disregard for human life. Moreover, in order for his sentence to constitute cruel and unusual punishment, such disproportionality would need to be so extreme that it "shocks the conscience and offends fundamental notions of human dignity." (*In re Lynch* (1972) 8 Cal.3d 410, 424.) Wilson has not met the extremely high burden of establishing this. (See *People v. Wingo* (1975) 14 Cal.3d 169, 174 [defendant must overcome a "considerable burden" to show a sentence is "grossly disproportionate" to the defendant's level of culpability]; see also *People v. Weddle* (1991) 1 Cal.App.4th 1190, 1196 ["[f]indings of disproportionality have occurred with exquisite rarity in the case law"].)

In sum, we cannot say that the additional circumstances Wilson identifies here are sufficient to render his LWOP sentence so disproportional as to be cruel and unusual. Thus, the " ' " ' "totality of the circumstances" surrounding the

35

commission of the offense' " ' " (*People v. Meneses* (2011) 193 Cal.App.4th 1087, 1092)—including Wilson's personal background and age—do not make his LWOP sentence unconstitutional.

### D.    Wilson's Custody Credits

We agree with both Wilson and the People that Wilson is entitled to presentence custody credits for the 1,340 days he spent in custody between his arrest and his sentencing. (See §§ 2900.5, 2933.05, 4019; *People v. Taylor* (2004) 119 Cal.App.4th 628, 647.)  "A sentence that fails to award legally mandated custody credit is unauthorized and may be corrected whenever discovered."  (*Ibid.*)  We decline to amend the judgment in this respect, however, given Wilson's LWOP sentence.

### E.    Joint and Several Liability for Restitution Order

The court ordered Wilson to pay $594 to reimburse the California Victim Compensation Board and pay $1,200 for Ryan Sniffin's burial expenses.[13]  The court must order restitution in an amount sufficient to reimburse the victim "for every determined economic loss incurred as the result of the defendant's criminal conduct."  (§ 1202.4, subd. (f)(3).)  A trial court has authority to make the restitution obligation joint and several.  (See, e.g., *People v. Neely* (2009) 176 Cal.App.4th 787,

---

[13] The restitution amount for burial expenses would be payable to a "victim" of the crime, which for the purposes of section 1202.4 could include, for example, "[t]he immediate surviving family of the actual victim."  (§ 1202.4, subd. (k) & (k)(1).)

800.) Because the goal of the victim restitution statute is "that a victim of crime who incurs an economic loss as a result of the commission of a crime shall receive restitution directly from a defendant convicted of that crime" (§ 1202.4, subd. (a)(1)), we agree with both Wilson and the People that the victim in this case is entitled to collect restitution from all those convicted of Ryan Sniffin's murder.

## DISPOSITION

Kenneth Wilson's convictions are affirmed, but the court shall modify the order of restitution to be joint and several with any other defendant convicted of the murder of Ryan Sniffin. As so modified, the judgment against Kenneth Wilson is affirmed.

This court issued the remittitur in Jesse Keith Cottom's appeal on December 7, 2023, at which point our original opinion filed March 1, 2023 "bec[a]me final as to appellant Jesse Keith Cottom only." Thus, our vacatur of the original opinion has no effect on the disposition of Cottom's appeal.

NOT TO BE PUBLISHED.



ROTHSCHILD, P. J.

I concur:



BENDIX, J.



WEINGART, J.

38